257 So.2d 413

**LOUISIANA STATE BAR ASSOCIATION**

v.

**Charles G. JACQUES, Jr.**

**No. 50979.**

Jan. 17, 1972.

Rehearing Denied Feb. 21, 1972.

Louisiana State Bar Assn. Committee on Professional Responsibility: A. Leon Hebert, Chairman, Baton Rouge, Pat W. Browne, Sr., James H. Drury, New Orleans, Leonard Fuhrer, Alexandria, Edgar H. Lancaster, Jr., Tallulah, Henry A. Politz, Shreveport, John F. Pugh, Thibodaux, A. Russell Roberts, Metairie, John B. Scofield, Lake Charles, Thomas O. Collins, Jr., New Orleans, for petitioner.

Milton P. Masinter, New Orleans, for respondent.

DIXON, Justice.

The Louisiana State Bar Association, through its Committee on Professional Ethics and Grievances, instituted these proceedings against Charles G. Jacques, Jr., a member of the Louisiana Bar practicing in New Orleans, alleging that the committee had conducted a full investigation of certain alleged misconduct on the part of respondent. After a full hearing in accordance with Rule XVI of this court and Article XIII of the articles of incorporation of the Louisiana State Bar Association of 1941 (now Article XV), the committee was unanimously of the opinion that the respondent had been guilty of violations of ethical standards of sufficient gravity to warrant disciplinary action and to evidence a lack of moral fitness for the practice of law.

We agree with the findings of fact and law of the Commissioner and paraphrase *in extenso* his statement of the case.

As provided by the rules of this court, notices were given to respondent in communications addressed to him under date of June 8, 1970 of six specifications and under date of July 17, 1970 of one additional specification. Hearings were held on specifications Nos. 1 through 6 on July 13, 1970 and on specification No. 7 on July 27, 1970. The committee unanimously concluded that the respondent was guilty of misconduct as set forth in five of the seven specifications. (The complaining witnesses in specifications 2 and 3 did not wish to pursue their complaints). The committee then filed these proceedings, and prayed that the court appoint a commissioner to take the evidence and, in due course, report to this court his findings of fact and conclusions of law and that, ultimately the respondent be suspended from the practice of law and his name stricken from the Roll of Attorneys and his license to practice law in the State of Louisiana be canceled for a period deemed appropriate by this court. Respondent was personally served with said

petition for disbarment on November 10, 1970 but failed to answer thereto. On December 16, 1970, on motion by the committee, this court appointed Albert J. Flettrich as Commissioner to take evidence and report his findings of fact and conclusions of law.

After due notice, a hearing was held by the Commissioner on March 10, 1971. On the morning of the hearing, respondent filed an answer to the committee's petition for disbarment, the contents of which will be considered in connection with the discussion of each individual specification.

Specifications Nos. 1 and 7, involved the same subject matter and will be considered together following the comments regarding specifications 2 through 6.

Specification No. 2 originated in a letter written by Frank W. White addressed to Mr. Thomas O. Collins, Jr., counsel for the committee, dated January 13, 1970, wherein Mr. White alleged that respondent had allowed prescription to run against the claim of his (White's) wife and two daughters for personal injuries and property damage resulting from an automobile accident on August 9, 1968. However, by letter dated July 1, 1970 Mr. White informed Mr. Collins that his reporting this complaint to the Louisiana State Bar Association was the result of a misunderstanding between him and his wife and respondent. In this letter Mr. White requested the committee to drop "the entire matter." As a result of said letter, the committee withdrew specification No. 2.

Specification No. 3 originated in a letter addressed to Mr. Tom Collins and members of the Louisiana State Bar Association by Thomas McCain Day which was received by the bar association on February 20, 1970 wherein Mr. Day alleged that respondent was supposed to be representing him in two cases, one of which had been pending three and one-half years and the other one and one-half years. Complainant contended that he was seldom able to contact respondent and when he did respondent's favorite trick was telling him to call back in a couple of weeks and he would have his cases settled and then it was usually four to six weeks before he could talk to him again. Complainant requested the help of the bar association. However, on July 7, 1970 the complainant addressed a letter to the bar association stating that he wished to withdraw his complaint against respondent and that he was completely satisfied. Because of the complainant's refusal to appear and testify, the committee was unable to pursue the charges further.

Specification No. 4 originated by virtue of a letter addressed to Mr. Thomas Collins of the Louisiana State Bar Association by Rudolph F. Borja, Sr., dated March 24, 1970 wherein complainant stated that on September 29, 1969 he paid re-

spondent $240.00 to file bankruptcy proceedings on his behalf. Although complainant signed all of the papers necessary, the bankruptcy proceedings were never filed despite repeated efforts and requests by the complainant to respondent to do so. It was brought out during the hearing that respondent did without justification attempt to apply this sum to fees allegedly due for other services. Subsequent to the hearing before the committee on July 13, 1970 respondent did refund complainant's payment of $240.00.

Specification No. 5 originated in a letter addressed by Carrol L. Guidry to Mr. Thomas Collins of the Louisiana State Bar Association dated April 2, 1970 wherein he alleged that the first time he went to see respondent was in September of 1968 for the purpose of obtaining a separation from his wife. At that time complainant paid respondent $200.00 for which complainant states respondent wrote a couple of letters and made a couple of telephone calls to Slidell and Covington, Louisiana. Then in October, 1968 complainant's wife filed a petition for divorce in Covington, Louisiana at which time respondent charged complainant an additional $200.00 for handling the defense of his wife's divorce action. Complainant charged that respondent did not represent him when the case came up for hearing and he had to get another lawyer. He stated that he called respondent's office many times but was

never able to contact him nor did respondent return his telephone calls. Respondent in his answer filed in this record on the morning of the hearing before the Commissioner (on March 10, 1971) in response to specification No. 5 alleged that he returned the sum of $200.00 to Mr. Guidry, despite the pleadings filed and work done. It was not until March 9, 1971, the day before the hearing before the Commissioner, that respondent drew his check No. 168 to Carrol L. Guidry for $200.00 in return of the fee paid to him in connection with the defense of his wife's divorce action.

Specification No. 6 originated by virtue of a letter addressed by Floyd Montgomery to Mr. Thomas O. Collins, Jr. of the Louisiana State Bar Association dated May 5, 1970 wherein complainant alleged that on January 5, 1965 a suit was filed by him (Floyd Montgomery) and Joseph Smith against the Shieldstone Laboratory Company. Complainant's attorney was Mr. Charles G. Jacques, Jr., respondent herein. The complainant alleged that respondent had him taking treatments for a long time but during the past year he was unable to contact respondent, nor would respondent write him or return his telephone calls; in other words, after five years he alleged that respondent refused to discuss his case. During the hearing before the Commissioner some questions arose as to whether or not this case had prescribed by virtue of the fact that a petition had not been filed with-

in one year of the date of the accident or whether or not the case had prescribed for lack of prosecution within five years of the date of filing. Respondent stated that the case had definitely not been filed. In his answer to specification No. 6, respondent alleged "that Montgomery was paid and a full release secured from him through his attorney." During the hearing before the Commissioner it developed that complainant had not been paid nor a release secured as of that time. Respondent testified that he had negotiated a settlement with Mr. E. Howard McCaleb III, attorney for Floyd Montgomery; that he agreed to compromise and settle the Montgomery claim for $500.00 and on March 9, 1971, the day before the Commissioner's hearing, he drew his check No. 167 for $500.00 to Floyd Montgomery and Howard McCaleb, III, his attorney, and forwarded it together with a receipt and release to Mr. McCaleb by letter dated March 9, 1971.

Specifications Nos. 1 and 7 were the most serious of the charges brought by the committee against respondent. These specifications originated when the committee received a letter from Joan Elaine Chauvin dated December 29, 1969. She had been formerly associated with respondent in the practice of law, and when she joined the staff of United States Attorney in New Orleans she turned over to respondent all of her open and pending cases under an agreement whereby she would receive one-half of any fees collected, less costs. One of the cases turned over by her to respondent was a Jones Act case entitled Booth et als v. Chotin, Inc., No. 1834 of the United States District Court for the Eastern District of Louisiana. Miss Chauvin charged that on April 22, 1969 respondent received from Phelps, Dunbar, Marks, Claverie & Sims a check for $72,500.00 in settlement of this case. The Booths were originally clients of Miss Chauvin and when the cause of action arose she agreed with Mrs. Booth that she would handle the case on a contingent fee of one-third of the amount recovered. She then prepared and filed the petition in the United States District Court. Respondent, through negotiation with Mr. Charles E. Dunbar III, of the firm of Phelps, Dunbar, Marks, Claverie & Sims, compromised and settled the claim, as stated above on April 22, 1969, for $72,-500.00. The check for $72,500.00 was deposited by respondent in his checking account, entitled "Charles G. Jacques, Jr., Attorney at Law" bearing No. 12–50–9486–4, in the Hibernia National Bank in New Orleans on April 24, 1969.

At the time of the settlement, Mr. Dunbar testified that he went to respondent's office and met with him and his client, Mrs. Booth and other members of her family. At the time the check was given to respondent, Mrs. Booth executed a full release and also agreed to hold defendants harmless against any claim which might be later made by

the minors, if any such claims were ever presented. It was Mr. Dunbar's understanding with respondent that out of an abundance of caution a succession would be opened and Mrs. Booth would be qualified as administratrix of her minors' estates and at that time she would execute another release. However, Mr. Dunbar testified that it was not a condition of the settlement that the $72,500.00 check not be negotiated. It was not until December 8, 1969 that respondent finally paid Mrs. Booth the amount due her as her share of the claim, $40,833.33 ($48,333.33 less $7,500.00 previously paid). And it was not until immediately after the first hearing before the committee on July 13, 1970 that respondent finally settled with Miss Chauvin for her portion of the attorneys' fees.

The committee filed specification No. 7 on July 17, 1970, which in effect charged that (1) the funds received by respondent in the Booth case were commingled with his personal funds and (2) he converted a portion of these funds to his own personal use. The committee subpoenaed that portion of respondent's bank account at the Hibernia National Bank in New Orleans from April, 1969 through July, 1970. The bank account was produced and was the principal subject of the second meeting of the committee which was held on July 27, 1970. The bank account reflects the deposit by respondent of $72,500.00 in his said account on April 24, 1969. The account also reflects that on November 19, 1969, which was prior to the disbursement of any funds to Mrs. Booth or to Miss Chauvin, only the sum of $23,664.51 remained therein. Through successive deposits during the latter part of November and the early part of December, respondent built the account back up to $44,024.57 and on December 8, 1969 a check payable to Mrs. Booth in the sum of $40,833.33 was debited against the account. And on July 14, 1970, the day following the first meeting of the committee, a certified check payable to Miss Chauvin in the sum of $10,000.00, representing the balance due on her share of the attorneys' fees, was debited to the account.

At the first meeting of the committee on July 13, 1970 respondent testified that he had not expended any of the funds derived through the Booth settlement except $7,-500.00 which he had advanced to Mrs. Booth. During the second hearing on July 27, 1970, after being confronted with his bank statement and Mr. Dunbar's testimony, respondent was asked if he still stood on that statement to which question respondent replied "no sir I do not." Respondent admitted he had lied because he was "scared and frightened and panicked."

Respondent tried to explain his delay in disbursing the proceeds of the Booth settlement by stating that he was waiting until the final releases were obtained through the succession proceedings in Covington. The Commissioner thought, however, this

explanation of no avail to him because he had no explanation or justification for only having $23,664.51 left in his bank account on November 19, 1969, at which time he still owed Mrs. Booth $40,833.33 and Miss Chauvin $12,000.00, her one-half of the fee. At that moment, he owed his client and fellow attorney a total of $52,833.33 and only $23,664.51 remained in his checking account.

Article 14 § 11 of the articles of incorporation of the Louisiana State Bar Association provides:

"The lawyer shall refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer shall be reported and accounted for promptly, and shall not under any circumstances be commingled with his own or be used by him."

The article is applicable here.

The Commissioner found that the respondent did not seriously dispute any of the allegations. He noted in his delayed answer to the committee's petition that respondent attempted to exculpate himself by either saying that the complainants were paid or had withdrawn their charges. However, the Commissioner believed, because of the facts and circumstances surrounding the payments or withdrawal of charges by the various complainants, that either the payments or the withdrawal of the charges occurred only because of proceedings brought by the bar association.

The Commissioner believed that the respondent had violated his professional duty and displayed a lack of professional integrity by his continued failure to respond to his clients' efforts to contact him, by his permitting cases to prescribe, by commingling his clients' funds with his own funds and by converting his clients' funds to his own personal use, all of which was detrimental to the integrity of the legal profession and required disciplinary action.

The Commissioner noted that the respondent could not in any way justify his use of his client's funds. From August 1 to November 19, the only money in respondent's account belonged to his client; on November 19, when she was due over $40,000.00, there was only $23,664.51 in the bank. Furthermore, his delay in accounting to his fellow attorney for her share of the attorneys' fees was reprehensible to say the least. It was noted that the settlement with his co-counsel was only made the day after the first committee hearing was held. The Commissioner was convinced that restitution and settlement by respondent with his clients and co-counsel was only made under the pressure of the disbarment proceedings.

The Commissioner cited and discussed six cases of this court to reach a conclusion:

Louisiana State Bar Association v. Blum, 256 La. 530, 237 So.2d 366; Louisiana State Bar Association v. Klein, 253 La. 603, 218 So.2d 610; Louisiana State Bar Association v. Haylon, 250 La. 651, 198 So.2d 391; Louisiana State Bar Association v. Van Buskirk, 249 La. 781, 191 So.2d 497; Louisiana State Bar Association v. Mayeux, 249 La. 7, 184 So.2d 537; and Louisiana State Bar Association v. Powell, 248 La. 237, 178 So.2d 235.

These cases abundantly support the Commissioner's conclusion that respondent's conduct requires disciplinary action.

■ Respondent contends that Article 13 § 4 and Article 14 § 11 of the articles of incorporation of the Louisiana State Bar Association are unconstitutionally vague and over broad when construed either separately or together. That is, he contends that the articles provide that if a majority of the ethics and grievance committee is of the *opinion* that an attorney has *probably* been guilty of a violation of the laws relating to the professional conduct of attorneys and the practice of law or that the attorney has probably been guilty of a willful violation of a rule of professional ethics of *sufficient gravity* as to evidence a *lack of moral fitness for the practice of law,* the committee may institute a suit for disbarment or suspension and that same does not lay down sufficient standards as to what constitutes a violation.

There is no merit to this contention. The Committee on Professional Ethics and Grievances is empowered by law to hold hearings upon alleged misconduct. Article 13 § 2, Louisiana State Bar Association articles of incorporation. That article places the responsibility of investigating all complaints looking to the suspension and disbarment of an attorney in the Committee on Professional Ethics and Grievances. "(T)he committee may designate one or more of its members to take testimony and examine witnesses on behalf of the committee." If it concludes that there may be misconduct, it petitions this court to appoint a commissioner, hold a hearing, etc. The committee cannot disbar any member. Only this court has original jurisdiction to hear such matters under the Louisiana Constitution Article 7 § 10. The committee serves a quasi-judicial function. It receives evidence and allows the accused attorney a chance to be heard, to cross-examine witnesses, to call witnesses in his own defense, etc. Respondent has not at any stage of the proceedings pointed out wherein he was deprived of any constitutional right under the United States or Louisiana Constitutions, nor in what manner his rights were prejudiced. Respondent never once objected to the proceedings against him. Respondent could have adduced any evidence necessary for his defense. He was informed of his rights in

the letters by the committee to him advising him of the hearings on the specifications.[1]

We note that at the hearings before the Committee on Professional Ethics and Grievances and the commissioner appointed by this court that the respondent was advised of his right to have counsel present and that respondent voluntarily waived his right.

Respondent relies on the case of In re Novo, 200 La. 833, 9 So.2d 201 for the proposition that there are no standards by which respondent can gauge his conduct. We disagree. This court found (in Novo) that the evidence indicated a legitimate dispute as to the computation of the fee which negated an intent to improperly commingle and convert. Under specification No. 7 in the case before us there was no fee dispute between respondent and his client whose funds he did commingle and convert. The transcript reflects that the respondent did not have a legitimate fee dispute with his co-counsel, Miss Chauvin. He admitted to the committee that he lied, that he did owe

Miss Chauvin her one-half fee ($12,000.00) and that he refused to pay her. Besides, Article 14 of the Louisiana State Bar Association articles of incorporation lays down clear standards of conduct by which an attorney can gauge his conduct.

■ Respondent complains that the Commissioner erred in admitting into evidence the transcript of the hearings held by the committee on July 13, 1970 and July 17, 1970.

The transcript was made a part of the petition by the committee when it filed the petition in this court. It is a well settled rule of this court that the transcript of the evidence taken at the hearings before the Committee on Professional Ethics and Grievances is admissible. Louisiana State Bar Association v. Sackett, 231 La. 655, 92 So.2d 571; Louisiana State Bar Association v. Ricard, 237 La. 530, 111 So.2d 761. Pursuant to our rules, the respondent in the case before us was advised of his right to counsel, that all witnesses were subject to cross-examination, that he had

---

1. The letters to Mr. Jacques advising him of the committee hearings read, in pertinent part, as follows:

"Under the rules, you are hereby given a full opportunity to defend yourself before this Committee by introducing evidence and by cross-examining witnesses against you, and you have the right to be represented by counsel. You also have the right to compel the production of any books, records, documents or other evidence that may be relevant to this matter under investigation. The Committee will subpoena any witnesses selected by you and will also issue any writs of subpoena duces tecum you may desire which are pertinent.

. . . . . .

"Please send immediately to the undersigned at 101 Supreme Court Building, 301 Loyola Avenue, New Orleans, Louisiana 70112, the names and addresses of any witnesses you desire subpoenaed or a full description of any matters which you desire placed under writ of subpoena duces tecum."

the right to call witnesses in his own defense, and that he had the right to object to the introduction of any evidence offered. And at the hearing held by the Commissioner, the respondent again was offered the opportunity to introduce any evidence that he might not have introduced at the hearing before the committee, and produce any witnesses in his own behalf. There is no denial of due process.

■ Respondent complains that he cannot be disbarred on probability only and that such violates his right to due process. Respondent misreads the rules of this court. The Committee on Professional Ethics and Grievances cannot disbar. All it does is find facts and decide whether there is a probability that an attorney has willfully violated the ethical code laid down by the profession. In a sense, it performs the same function as a grand jury. Only this court may disbar an attorney. And it does so only after appointing a commissioner to take evidence, make findings of fact and law and state his conclusions therefrom. The commissioner receives the evidence under rules affording the attorney his due process rights. Thereafter, the commissioner files his report with this court. And in argument before this court, the respondent may again raise the issue of whether he was denied due process.

■ Respondent contends that the standard of "moral fitness for the practice of law" is unconstitutionally vague. We disagree. The phrase means that one must conform to standards of character and conduct laid down by the profession. In other words, one must conform to the Canon of Ethics (now the Code of Professional Responsibility).

■ Respondent contends that he was not given adequate notice of the charges against him to be able to properly defend himself. He alleges this especially with respect to specification No. 7. He claims that he only had ten days to prepare a defense.

In support of his position, respondent cites the case of In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117. In Ruffalo, on the third day of a hearing before the Ohio Board of Commissioners involving twelve counts of alleged misconduct, the board added a thirteenth charge based solely on testimony of Ruffalo and his investigator given during the hearing on the twelve charges. Counsel for Ruffalo *objected* to the addition of the thirteenth charge. No further hearings or evidence was taken on the thirteenth charge, although the commission gave the respondent additional time to reply.

Respondent in the case before us never objected to the introduction of the seventh specification. He was allowed the right to testify and explain why he was not guilty of the charge. Instead, he admitted that

he had lied to the committee at its hearing on July 13, 1970 about related specification No. 1. Respondent never objected to specification No. 7 at his hearing before the Commissioner held March 10, 1971. The Ruffalo case is not applicable.

We note upon examining the record of the committee hearing on July 27, 1970 that respondent never complained of inadequate time to prepare a defense. He was an attorney. He could have asked the committee for more time. But he chose to proceed. He could have raised the same issue before the Commissioner. He cannot now complain. Even if respondent had complained, there would be no merit to his contention because we find that specification No. 7 is so closely related with specification No. 1 that for all intents and purposes they are one and the same.

■ It is a well settled principle that a disbarment proceeding is not so much for the punishment of the attorney as it is for the preservation of the integrity of the courts and the salutary effect it has upon other members of the bar. In re Novo, supra; Louisiana State Bar Association v. Blum, supra. See also Louisiana State Bar Association v. Cox, 252 La. 978, 215 So.2d 513; Louisiana State Bar Association v. Powell, supra; Louisiana State Bar Association v. Wheeler, 243 La. 618, 145 So.2d 774; Louisiana State Bar Association v. Haack, 243 La. 1108, 150 So.2d 32; In re Craven, 204 La. 486, 15 So.2d 861.

■ This court has consistently held that absent mitigating circumstances, the commingling of the client's funds with those of the attorney and converting them to the attorney's own use constitutes misconduct sufficient to warrant disbarment. Louisiana State Bar Association v. Blum, supra; Louisiana State Bar Association v. Klein, supra; Louisiana State Bar Association v. Haylon, supra; Louisiana State Bar Association v. Mayeux, supra. *The record discloses that there have been thirty-seven complaints against respondent since 1959 (for which respondent received six reprimands) plus the seven specifications here presented. This shows a course of conduct sufficient to warrant disbarment.*

■ The Committee on Professional Ethics and Grievances prayed in its petition as follows:

"WHEREFORE, petitioner prays that Respondent be ordered to plead or answer within fifteen (15) days from the date of service of a copy of this petition, and after issue joined, that the Court appoint a Commissioner to take the evidence, and, in due course, report to this Honorable Court his findings of fact and conclusions of law, and that, ultimately the Respondent be suspended from the practice of law, and that the name of Charles G. Jacques, Jr., Respondent, be stricken from the Roll of Attorneys and his license to practice law in the

State of Louisiana be cancelled for a period deemed appropriate by this Court."

Respondent contends that since the petition of the committee only prays for suspension, then this court is without power to disbar.

We disagree with respondent's interpretation of the prayer. The petition prays that the respondent's name "be stricken from the Roll of Attorneys and his license to practice law in the State of Louisiana *be cancelled for a period deemed appropriate by this Court.*" (Emphasis added). We also note that the petition is entitled "PETITION FOR DISBARMENT." It would require a strained interpretation to hold that the prayer and petition do not seek disbarment of respondent.

There is no difference between a prayer for suspension and a prayer for disbarment as to the requirements of due process. Respondent knew the charges against him. There is no reason to suppose that he would have defended himself with any more vigor had the prayer of the petition been phrased differently.

The fact that respondent had had a total of thirty-seven complaints of misconduct investigated by the bar association against him since 1959, exclusive of the seven before us, should be considered in the disposition of this case. The fact that respondent has repaid all parties who questioned his conduct after a hearing before the Committee on Professional Ethics and Grievances does not show that he was in good faith when the complaints arose.

Respondent has violated specific canons. He has misappropriated his clients' funds. His admission before the committee demonstrates that he has great difficulty in telling the truth, and should not be trusted. His misconduct is habitual and of long standing. His continued practice of law would be an intolerable burden to the profession, its disciplinary committee, and the public. Disbarment is an appropriate remedy.

For the reasons assigned, it is ordered, adjudged and decreed that the name of Charles G. Jacques, Jr., respondent herein, be stricken from the Roll of Attorneys and his license to practice law in the State of Louisiana be revoked and the same is hereby canceled.