320 So.2d 171 (1975)
LOUISIANA STATE BAR ASSOCIATION
v.
Jack P. F. GREMILLION, Jr.
No. 53007.
Supreme Court of Louisiana.
October 1, 1975.
A. Russell Roberts, Metairie Chairman, Wood Brown, III, New Orleans, Sam J. D'Amico, Baton Rouge, (Recused), Leonard Fuhrer, Alexandria, Harold J. Lamy, New Orleans, Edgar H. Lancaster, Jr., Tallulah, Henry A. Politz, Shreveport, John F. Pugh, Thibodaux, John B. Scofield, Lake Charles, Thomas O. Collins, Jr., New Orleans, Committee on Professional Responsibility, for plaintiff-petitioner.
M. Aubrey McCleary, Jr., McCollister, Belcher, McCleary & Fazio, Baton Rouge, Milton P. Masinter, New Orleans, for defendant-respondent.
DIXON, Justice.
The Louisiana State Bar Association, through its Committee on Professional Responsibility, instituted this disbarment proceeding against Jack P. F. Gremillion, Jr. Hearings were held before Frank W. Middleton, Jr., whom we appointed commissioner. The commissioner found against the respondent three specifications brought against him.
*172 The specifications involved forgery, misrepresentation of material facts, perjury and perhaps even theft. We agree with the findings of fact and conclusions of law of the commissioner and paraphrase in extenso his statement of the case.
The first specification considered by the commissioner involved a forged act of mortgage. The respondent required a client, Winfield A. Hayden, to execute two mortgages in his favor as security for his fee. These two acts of mortgage were allegedly passed before David L. Ray, Notary Public. In fact, the acts were neither signed by nor passed before David L. Ray. The respondent gave the acts, signed by himself and Hayden, to his secretary, with instructions to finish them herself"get the show on the road," in respondent's words.
The commissioner found:
". . . From this testimony, as well as that otherwise offered, in connection with this specification as well as the others, it would appear to have been the policy of Respondent and of his employees to supply the name of any Notary needed to complete any blank, whether said Notary was present, gave authority, or, in fact, had any knowledge of the transaction."
The second specification considered by the commissioner is not only more serious, but also casts stronger suspicion on the respondent's fitness to engage in the practice of law.
In December of 1970 respondent approached officers of the American Bank and Trust about a loan in order to purchase property owned by James Ott. The bank agreed to an $11,000 loan, subject to respondent's furnishing the bank with a title letter certifying his title to the property.
On December 30, 1970 respondent and Ott consummated a "sale with assumption of mortgage and mortgage" whereby respondent assumed the first mortgage and executed a second mortgage in favor of Ott. On that same day he executed a collateral mortgage in the sum of $11,000 in favor of the bank, secured by the Ott property.
By letter dated January 14, 1971, although in fact written some six weeks or more after that date, respondent's office issued a title opinion, stating that respondent had a valid and merchantable title and that the bank had a second mortgage on the property. This letter was purportedly signed by an attorney practicing in respondent's law firm. With regard to this title letter, the commissioner found:
"(1) The said title opinion was not, in fact, issued on January 14, 1971, but at least 6 weeks or more thereafter.
"(2) As of the date of the said title opinion, neither Respondent's title nor the bank's mortgage had been recorded and they were, in fact, not recorded until some 6 weeks after the date of said title opinion.
"(3) Even after delayed recordation, the title opinion was in error, as the bank had a third and not a second mortgage as recited in the said opinion.
"(4) No pretense of any title examination had been made, on the basis of which said title opinion letter and certification of examination was issued.
"(5) The attorney, allegedly signing said title opinion letter, was unaware of said title opinion. The matter had never been discussed with him and his signature was affixed by his secretary, directly or indirectly as a result of the instructions or orders of Respondent."
The respondent's only defense is his ignorance of how to handle real estate *173 transactions. This is, of course, no defense at all. See Disciplinary Rule 6-101:
"DR 6-101 Failing to Act Competently.
"(A) A lawyer shall not:
"(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it."
The commissioner found further irregularities in this transaction. The signature of David L. Ray as Notary Public before whom the collateral mortgage was allegedly passed was forged. Almost a year after the loan was passed, the respondent finally furnished the bank with a collateral mortgage note, also containing the forged signature of David L. Ray as Notary Public, despite the fact that Ray refused to paraph the note and despite respondent's knowledge that Ray's signature was forged on the collateral mortgage with which this note was being identified.
The commissioner concluded:
"Respondent promised the bank a Second Morgage, as security for its $11,000 loan to him. He did fail to mention deliberately or through total ingorance that a mortgage was also to be given to vendor, placing the bank in a position of Third Mortgage Holder. The Respondent failed to make any reasonable effort to furnish to the bank the Collateral Mortgage Note, copy of recorded Collateral Mortgage or Title Letter, as promised, until some months after the loan was made and after the date of execution of the Sale on December 30. The signature of the Notary on the Collateral Mortgage is forged. Whether this was done by Respondent or by one of his employees is unknown, but the transaction was handled by Respondent, the closing was in his office, the transaction was for his personal account and he alone is responsible to his lender, the bank, for the adequacy and propriety of the documentation furnished in accordance with his commitment. It appears there was no Collateral Mortgage Note at all executed until approximately one year after the transaction, and no such note was furnished to the bank until well after it was prejudiced by the absence of such for the purpose of suit and foreclosure. Respondent failed to record or to secure the prompt recording of his acquisition of the property and of the Collateral Mortgage until nearly two months after the date these transactions at least partially occurred on December 30, 1970."
The third specification is the most serious. This grew out of respondent's divorce from his first wife. In June of 1971 the respondent obtained a divorce from his wife in the First Judicial District Court for the County of Hancock, State of Mississippi. This divorce was based on a consent and waiver to divorce, allegedly signed by respondent's wife, which respondent presented to the Mississippi court. In fact, his wife had never signed or given authority to anyone else to sign for her such a waiver and consent. Furthermore, the signature of Lannis A. Kircus as Notary Public on the waiver and consent form was a forgery.
In defense, respondent asserts that his wife gave him verbal authority to sign the consent and waiver form for her. The Mississippi judge who granted the divorce testified that such verbal authority would be without effect and that he would not grant a divorce based on such a verbal authorization. However, pretermitting the issue of the effectiveness of such verbal authorization (which was denied anyway) we agree with the commissioner's statement that:
"It is almost inconceivable that any attorney, as Respondent, would undertake to claim verbal authority of the defendant to sign the defendant's name to a waiver of service and delays."
*174 Additionally, to meet Mississippi's one year residency requirement for divorce, the respondent swore out a false affidavit that he was and had been a bona fide resident of Mississippi for one year preceding the divorce. Since the divorce decree was rendered on the basis of oral testimony, we can only assume that respondent similarly gave false testimony in court.
The evidence shows that respondent was not in fact a bona fide resident of Mississippi for this period. He transacted his business from his Baton Rouge office. He maintained an apartment in Baton Rouge. He was registered to vote in Baton Rouge. He paid no Mississippi taxes and never met his Mississippi neighbors. He allegedly lived in a house being rebuilt after a hurricane. None of his partners, associates or secretaries were aware of this Mississippi residence. In the words of the commissioner, "the most that can be said is that respondent paid rent on a house never fully completed or furnished, for a period of one year, and was seen there on perhaps three occasions by one client." Also noteworthy is the fact that he paid the rent for May and June in advance, was divorced on June 17, remarried on June 19, never to return to his Mississippi "residence."
The report of the commissioner in this case is careful, detailed and accurate. Under his directions, the record reflects the hearings to have been models of propriety. The commissioner's conclusions are amply supported in each instance by the record. Little serious argument can be made with the correctness of his factual findings.
Respondent argues in brief that, since his conduct occurred in substance prior to September 1, 1971, which was the effective date of Article XV of the Articles of Incorporation of the Louisiana State Bar Association, he cannot be disciplined or disbarred in proceedings brought under this article, as the article makes substantive changes in the law. This contention is without merit. Article XV in no way attempts to define the substantive requirements for professional conduct which would subject a member of the bar to disciplinary proceedings. Article XV merely provides the procedure to be used in disciplinary proceedings. This section therefore changed no substantive rights of respondent; it only provided a better procedural method to handle disciplinary actions.
We are impressed with the obvious disregard by respondent of established ethical standards. The successive acts of the respondent indicate that as time went on the extent and seriousness of respondent's ethical misconduct increased. We observe here not a single isolated act, but a continuing pattern over a period of two years, progressing to the point of sufficient gravity as to evidence a lack of moral fitness for the practice of law. La. State Bar Assn. v. Powell, 250 La. 313, 195 So.2d 280 (1967).
It is appropriate to repeat at this point that a disbarment proceeding is not so much for the punishment of the attorney as it is for the preservation of the integrity of the courts and the salutary effect it has upon other members of the bar. La. State Bar Assn. v. Jacques, 260 La. 803, 257 So.2d 413 (1972); La. State Bar Assn. v. Ruiz, 261 La. 409, 259 So.2d 895 (1972). Respondent has violated the most basic and cherished principle of the profession:
"EC 9-6. Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and the judges thereof; to observe the Code of Professional Responsibility; to act as a member of a learned profession, one dedicated to public service; to cooperate with his brother lawyers in supporting the organized bar through the devoting of his time, efforts, and financial support as his professional standing and ability reasonably permit; to conduct himself so as to reflect credit on the legal *175 profession and to inspire the confidence, respect, and trust of his clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety."
For the reasons assigned, it is ordered, adjudged and decreed that the name of Jack P. F. Gremillion, Jr., respondent herein, be stricken from the Roll of Attorneys and his license to practice law in the State of Louisiana be revoked and the same is hereby canceled.