375 So.2d 89 (1979)
LOUISIANA STATE BAR ASSOCIATION, Petitioner,
v.
Roger W. JORDAN, Respondent.
No. 57734.
Supreme Court of Louisiana.
September 4, 1979.
Rehearing Denied October 8, 1979.
*90 Louisiana State Bar Ass'n, Committee on Professional Responsibility, Harold J. Lamy, New Orleans, Chairman, Roland J. Achee, Shreveport, Wood Brown, III, New Orleans, Sam J. D'Amico, Baton Rouge, Leonard Fuhrer, Alexandria, Edgar H. Lancaster, Jr., Tallulah, Aldred S. Landry, New Iberia, A. Russell Roberts, Metairie, John B. Scofield, Lake Charles, Thomas O. Collins, Jr., Executive Counsel, New Orleans, counsel for petitioner.
John D. Ponder, Amite, for respondent (defendant).
TATE, Justice.
This is a disciplinary proceeding against a member of the Louisiana bar, of which this court has original jurisdiction. La.Const. of 1974, Art. 5, Section 5(B). The Louisiana State Bar Association, appearing through its Committee on Professional Responsibility, instituted the present disciplinary proceedings against Roger W. Jordan, pursuant to Article XV of the Articles of Incorporation of the Association (1971), approved by us as a rule of this court. 21A West's LSA Revised Statutes 119 (1974).
In accordance with the procedures authorized by Article XV, the instant proceeding was preceded by a formal investigative hearing. As a result of the showing made at this hearing, this petition for disciplinary action was instituted by the bar association. A commissioner was appointed and heard evidence at two hearings.
The commissioner's comprehensive and scholarly report concludes that the respondent Jordan has been guilty of acts and omissions which do not conform to the standards of character and conduct required by the legal profession and that he violated the Code of Professional Responsibility in each of the four instances which are the subject of this proceeding. The commissioner's recommendation concluded that Jordan deserves the severest disciplinary action by this court. The bar association committee concurs in this recommendation.

The Four Specifications of Misconduct
Based on the showing made at the formal investigative hearing, the bar-association petition recommends disciplinary action based upon four specifications of professional misconduct. Three of them (Nos. 1, 3, and 4[1]) involve a failure to account to clients for moneys received in their behalf, and one of them (No. 5) involves a failure of the respondent to cooperate with the bar investigation or to furnish the bar committee with any information concerning the charges, despite notices and other demands for such cooperation.
We shall at this point note that, as the commissioner found, the evidence supports a finding of serious breaches of professional duty instanced by the latter three specifications.[2] By themselves they would deserve substantial disciplinary sanction.
*91 However, we will limit our discussion to Specification No. 1 (Matlock), because it represents the grossest breach of professional ethics and, by itself, requires the disbarment of the attorney.

Specification No. One (Matlock)
Based upon the evidence at the various hearings, the commissioner found that the respondent Jordan had in 1969 received $3,000 from a settlement negotiated for his client, Ms. Matlock, and had concealed that circumstance from his client  instead, retaining the proceeds for himself. This misconduct is established by clear and convincing evidence as required to establish facts meriting the discipline of an attorney. Louisiana State Bar Association v. Edwins, 329 So.2d 437, 441-42 (La.1976) and decisions therein cited.
Ms. Matlock's complaint to the bar association was made in August, 1974. At that time, she stated that she had been unable to receive information from the respondent Jordan concerning the status or progress of a claim for which she had retained Jordan seven years earlier.
In May 1967 she had retained Jordan on a one-third contingency fee basis to represent her in connection with a personal injury suit. Shortly afterwards she entered the military service as a nurse and was assigned to Japan until 1970, and thereafter was stationed at six or seven locations in the United States or overseas. Her complaint and her testimony at the hearing established that, despite numerous letters and unreturned telephone calls, she had been unable to learn from the respondent Jordan of the status of her claim, except on two brief visits in 1970 and 1971 (when Jordan had informed her that there was a delay in a law suit he had filed). She herself did not know whether Jordan had in fact filed the law suit.
At the investigative hearing of December 2, 1975, at which Jordan appeared as counsel representing himself, he stated that, although he acknowledged that Ms. Matlock had retained him, he could not recall any of the details of the case and had been unable to locate the file on the matter. He asked for fifteen days to reconstruct his file by way of locating papers indicated by various copies of documents furnished the committee by Ms. Matlock. He was given fifteen days to do so, and he requested at least one extension thereafter.
Nevertheless, he never filed any further response with the committee. Consequently, the bar association in March, 1976, filed a request for disciplinary action, and as to the Matlock complaint charged him with Specification No. One as follows:
"That during 1967, you were retained by Ms. India J. Matlock to represent her concerning her claim for damages as a result of an automobile accident in which she was involved on or about May 16, 1967. That despite numerous demands upon you for status reports by your client, you have failed, refused, and neglected to advise her of the status of her claim or to timely perform the services for which you were employed."
The first disciplinary hearing before the commissioner on this and the other specifications was held on August 20, 1976. At that time, represented by counsel, the respondent Jordan testified as a witness.
*92 Jordan stated that he had no recollection that a suit had been filed, that he had been unable to find the file in his office, and that he had checked the records in Orleans Parish (see later) and had been unable to determine that a suit had in fact been filed. He therefore formally offered to waive prescription against a suit of malpractice on Ms. Matlock's part.
Subsequent to this hearing, Ms. Matlock did retain counsel to pursue the claim against Jordan. In conducting his investigation, Ms. Matlock's attorney discovered that a suit had been filed in Jefferson Parish in 1968; that this suit had been compromised on November 7, 1969 by Jordan on Ms. Matlock's behalf (as authorized by her power of attorney); and that an insurance draft in the amount of $2,000 and an uninsured co-defendant check in the amount of $1,000, payable jointly to Ms. Matlock and to Jordan, had been turned over to Jordan. These circumstances were communicated to Jordan and his attorney.
Most telephone calls and the various registered return receipt letters by the attorney to Jordan were not acknowledged. However, on at least one occasion Ms. Matlock's attorney was able to speak to Jordan, who negotiated briefly about paying any amount due by installments. No further communication from Jordan was received by the attorney.
Receiving no response from Jordan, Ms. Matlock's attorney made a claim against the client's security fund of the Louisiana State Bar Association. The claim was for the $2,000 of Ms. Matlock's money fraudulently and dishonestly converted by Jordan to his own use (i. e., the $3,000 settlement less the one-third contingency fee).
On receiving this information, the commissioner re-opened the disciplinary proceedings and held a further hearing on April 17, 1978. Jordan received notice of this hearing, but he did not attend it, although his lawyer did. At the conclusion of the hearing, the commissioner afforded the lawyer an opportunity to re-open the hearing to receive Jordan's testimony as to the newly discovered conversion evidence. Despite this opportunity, no request was received for re-opening the hearing so that Jordan might offer an explanation of the damaging testimony evidencing a conversion to his own use of his client's funds.
The evidence above summarized as to the settlement of the suit is uncontested. Clear and convincing evidence further proves Jordan's conversion of his client's funds:
The $2,000 insurance draft, payable to Ms. Matlock and Jordan, was turned over to the respondent Jordan in 1969. By the date of the 1978 hearing, a copy of the draft was unavailable; however, the insurance company attorney testified that, if the draft had not been paid in 1968, his company would have complained to him.
The $1,000 check drawn from the uninsured co-defendant was made payable to Jordan and Ms. Matlock. Her name was endorsed by Jordan pursuant to his authority from her, and he also endorsed it as co-payee. The check was presented to the bank by, and paid in cash to, Patricia Perkins (who we are informed was Mr. Jordan's secretary).

The Respondent Jordan's Opposition to the Commissioner's Findings
By brief and by formal opposition, through his lawyer, the respondent Jordan suggests two principal reasons to discount the commissioner's findings:
(1) He argues that clear and convincing evidence does not establish the conversion of the client's money. He suggests that possibly the $2,000 draft had been mailed to Ms. Matlock and somehow lost in the mail or appropriated by someone else, and that it may have been appropriate for Jordan to retain the $1,000 check as his (one-third contingency fee) share of the proceeds.
In the first place, this argument by counsel is unsupported by any evidence. Jordan himself did not attempt to testify under oath to offer any such explanation.
In the second place, even if there had been such a sworn attempt at exculpation, the overwhelming preponderance of the evidence, in our view, shows clearly and convincingly *93 that Jordan received the draft and check, endorsed them, and made no effort to forward to his client her two-thirds share of the proceeds thus received by him. For instance, Jordan did not advance this explanation in reply to Ms. Matlock's repeated written and telephonic queries following 1969, most of which were unacknowledged. In fact, in 1970 and 1971, when she managed to catch him on brief visits to New Orleans, his explanation for the delay to her was that he had filed suit and was waiting for a trial date, (see Tr. 90, Investigative Hearing of December 2, 1975, where Jordan suggested to the witness that this had been his explanation for the delay to her at the time).
(2) He argues that the specification (see above) only alleged that Jordan had failed and refused to advise Ms. Matlock of the status of her claim, whereas the charge tried at the re-opened disciplinary hearing of April 17, 1978, concerned his conversion of her funds. He suggests that it was erroneous to convert the charge against him to one not specified by the pleadings.
In the first place, this squarely posed issue was the sole charge tried at the re-opened 1978 hearing, at which the respondent Jordan was represented by counsel. Although this issue was not raised by the initial pleadings, it was tried by express and implied consent of the parties, and thus is properly treated in all respects as if tried by the pleadings. See La.C.Civ.P. art. 1154; see also Articles of Incorporation of the Louisiana State Bar Association Article XV ("Discipline and Disbarment of Members"), Section 6 ("Disbarment and Suspension Suits"), Subsection (e) ("Practice before Commissioner"): "Except as otherwise provided herein, the practice before the commissioner shall conform as near as may be to the procedures of civil suits before the district courts of this state. * * *"
In the second place, we do not find it to be a persuasive defense against the severest disciplinary action, even under the limited specification as originally stated, that respondent attorney had not merely failed and refused to inform Ms. Matlock of the status of the suit and its settlement (as initially charged), but that he had also stolen the proceeds in the course of such misconduct.

Conclusion
We agree with the findings of fact and law of the commissioner and conclude that disbarment is required in order to protect the public and the courts. This court has held repeatedly that the conversion of a client's funds to the attorney's own use evidences a lack of moral fitness to practice law and constitutes misconduct sufficient to warrant disbarment. Louisiana, State Bar Association v. Philips, 363 So.2d 667 (La. 1978); Louisiana State Bar Association v. Selenberg, 270 So.2d 848 (La.1972); Louisiana State Bar Association v. Jacques, 260 La. 803, 257 So.2d 413 (1972); Louisiana State Bar Association v. Van Buskirk, 249 La. 781, 191 So.2d 497 (1966).
The respondent Jordan commingled and converted Ms. Matlock's funds and attempted to cover up the fact that her case had been settled and that he had received funds in connection with the settlement. Since 1970, he has continued to ignore her requests for information as to the status of her claim, forcing her to go to the bar association for assistance and to incur the expense of additional legal counsel. In order to protect the public, disbarment is well-merited for such misconduct.
As we stated in Louisiana State Bar Association v. Van Buskirk, cited above, at 191 So.2d at 498: "Because of their professional status, attorneys must adhere to a high standard of conduct in relations with their clients. The conversion of a client's funds is one of the most serious violations of an attorney's obligations. For the protection of the courts and the public, we have concluded respondent must be disbarred."

Decree
For the reasons assigned, it is ordered, adjudged, and dedreed that Roger W. Jordan, be and he is hereby disbarred, effective this date, from the practice of law in Louisiana. *94 The respondent is to bear all costs of this proceeding.
DISBARMENT ORDERED.
NOTES
[1] The investigative hearing had also considered a specification (No. 2, Polkey) that the respondent Jordan had overcharged a client under a contingency fee arrangement. After the evidentiary hearing, the committee concluded that Jordan had not violated any professional duty in this regard.
[2] For instance, Specification Nos. 3 (Bowers) and 4 (Jacqueline Restaurant Corporation) both involve the failure of the respondent to make a formal accounting of moneys received on the clients' behalf despite repeated requests by them for such accounting. In both of these instances, the clients were required to retain attorneys to ascertain what had happened to the excess (after payment of fees and debits) of moneys received by the attorney on behalf of the client and held in escrow by the attorney.

In both instances, it was eventually determined (months or years after the first client request) that, in fact, the respondent Jordan did not owe the clients any money, because the excess was owed to Jordan for fees for other unrelated matters. Nevertheless, despite repeated requests in the interval by the clients for an accounting, Jordan had failed to so inform them. It required a court suit in one instance and a full disciplinary proceeding in the other to establish finally that Jordan had not kept money for himself was not due him by the clients. (He had not at the time informed the clients that he had charged them the respective fees for unrelated services and hence had deducted them from the sums held in escrow.)
Pretermitting the propriety of diverting funds held in escrow for such purpose without the consent of the client (or at least formally charging him and so informing him), the respondent Jordan's complete failure to reply to queries by his clients or to account to them for their funds involved a callous disregard of professional responsibility and of fiduciary duty owed his clients.