486 So.2d 116 (1986)
LOUISIANA STATE BAR ASSOCIATION
v.
Wilmer G. HINRICHS.
No. 84-B-1459.
Supreme Court of Louisiana.
March 31, 1986.
*118 Thomas O. Collins, Jr., Wood Brown, III, New Orleans, Robert J. Boudreau, Sam J. D'Amico, Baton Rouge, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee', Metairie, Roland J. Achee, Shreveport, Gerald F. Thomas, Natchitoches, for applicant.
Wilmer G. Hinrichs, New Orleans, in pro. per.,
DENNIS, Justice.
We granted rehearing in this attorney disciplinary proceeding to re-examine the sanction imposed. Reviewing the record anew, we find facts that basically agree with those stated in our original opinion.
Wilmer G. Hinrichs was retained by Griffin A. Revere to represent him in a worker's compensation claim. The claim was settled for $13,185 on October 26, 1982. On October 29, 1982 the trial court in St. Charles Parish approved the settlement. A draft for the full amount was issued by Employer's National Insurance Company. This draft, payable to both Revere and Hinrichs, was endorsed by both, and deposited by Hinrichs into his client trust account at the Whitney National Bank on October 29, 1982. On the same day, Hinrichs issued a check drawn on the trust account to Revere in the amount of $11,200, *119 which represented Revere's portion of the settlement.
The check Hinrichs gave his client was returned because of insufficient funds. A $6,716.68 check written on the account by Hinrichs to pay a personal debt, issued in September and postdated October 22, 1982, cleared the bank on October 29, 1982, the same day the settlement proceeds were deposited. The funds of Hinrichs' client were depleted by the check Hinrichs had issued to his personal creditor, leaving an insufficient amount to pay the $11,200 check to his client.
In November 1982, Hinrichs made a partial payment of $3,200 to Revere. Revere made several unsuccessful attempts to collect the remaining $8,000 from Hinrichs. In January 1983 Revere retained another attorney, Jacques F. Bezou, to assist him in collecting from Hinrichs. Bezou demanded full payment from Hinrichs on February 3, 1983. On February 18, 1983, Bezou sent complaints regarding Hinrichs' conduct to the Louisiana State Bar Association and the District Attorney of St. Charles Parish, where the worker's compensation claim arose. On February 23 Bezou filed suit against Hinrichs in Civil District Court to recover the funds due and for damages.
On March 18, 1983, Hinrichs sent $4,000 to Bezou for Revere's account. On May 19, 1983, he sent an additional $1,000, and on June 10, 1983, he paid the final $3,000 due to Revere from the worker's compensation settlement. On the date the suit was set for trial, June 29, 1983, the parties settled the damage claim. Hinrichs paid Revere an additional $3,500 and waived his quantum meruit claims for other work he had done for Revere.
Revere was injured by the delay in payment from Hinrichs. Several checks Revere wrote were returned NSF because the funds he had counted on receiving from the check from Hinrichs could not be collected. He reported not having enough money to meet his everyday living expenses as a result of the problem Hinrichs had created, and he had trouble paying his creditors. He had no financial reserve at the time, other than equity in illiquid real estate, and as a result his credit rating suffered seriously.
The evidence is clear and convincing that Hinrichs knew or should have known of the reckless gamble he took with his client's money. The odds were not good that Revere's check would reach the bank before the earlier check for Hinrichs' personal debt. Hinrichs' somewhat inconsistent excusesfirst, that federal tax liens spoiled his plans to get a loan to cover the outstanding check, and second, that he simply "lost sight of" the check because of his financial difficultiesdo not mitigate his gross negligence in handling his client's funds.
The purposes of a disciplinary proceeding are to evaluate the character of a lawyer, in the light of his conduct and background, to determine whether he is morally fit to continue in the practice of the law; and to remove him from the profession if he is unable or likely to be unable to discharge his professional duties; or, if the lawyer is reformable, to impose a suspension or other sanction to correct and deter the errant attorney, deter other lawyers from similar misconduct, and recompense for the damage done to the legal profession and the administration of justice. LSBA Arts. of Incorp., Art. XV, §§ 5, 6 and 8; LSBA v. Bensabat, 378 So.2d 380 (La.1979); LSBA v. Philips, 363 So.2d 667 (La.1978); LSBA v. Gremillion, 320 So.2d 171 (La.1975); LSBA v. Weysham, 307 So.2d 336 (La. 1975).
Whether a person is of good moral character is decisive of his admission to the bar, his disbarment, or his reinstatement. LSBA Arts. of Incorp., Arts. 14 § 7; Art. 15 § 6, 12(b)(1). Although the term "good moral character," by itself, is ambiguous and can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law, it has long been recognized as a legitimate qualification for membership in the Bar and has served a useful purpose in this respect. See Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); *120 Hood, Renewed Emphasis on Professional Responsibility, 35 La.L.Rev. 719, 723 (1975).
In a disciplinary proceeding this court decides whether an attorney found guilty of misconduct is morally fit to continue in practice primarily by evaluating his understanding of and dedication to the ethical precepts of his profession as well as his inner strength and resolve to adhere to them in the future. When a lawyer violates his fiduciary responsibility to his client the main bases for this evaluation are the nature and circumstances of his offense. If his violation was intentional, or grossly negligent, that fact may indicate a lack of strong dedication to his client's interest or to the ideals of his profession. The commission of a forgery or other offense in connection with a conversion or commingling shows that the attorney not only had little regard for the client's interest, but also that he deliberately violated it. That the attorney made restitution after his misconduct may be considered in mitigation, and reimbursement made prior to the filing of a disciplinary complaint or commencement of legal proceedings can be a reliable indicator of conscience and moral character. Similarly, an attorney's prompt compliance with his client's request to turn over funds or property is much more indicative of good character than is a tardy compliance after many requests. The magnitude of the damage or the risk of damage to the client, the profession or the administration of justice resulting from the attorney's infraction may indicate the degree of his lack of commitment to professional responsibility. Other factors, such as the attorney's previous disciplinary record, his cooperation in the disciplinary proceedings, his reputation among his peers and in the community, and his age, health and experience are taken into consideration to illumine the attorney's conduct and moral character.
When this court determines that an attorney found guilty of misconduct is not so morally corrupt as to be removed from practice, it proceeds to impose a lesser sanction that will appropriately further the disciplinary goals. The attorney may be suspended or subjected to other sanctions for the purposes of protecting the public and of assuring the attorney's reform and return to practice as a morally fit person. Moreover, the sanction must also be of sufficient detriment to discourage others from the commission of similar violations. Finally, the suspension or other penalty imposed on the attorney must be one which will be regarded by the public and the bar as appropriate to redress the wrong done to the legal profession and to the administration of justice. It follows that in such cases the choice of sanctions becomes a question of degree, for which no definite rules can be laid downbut the factors used to evaluate moral character for purposes of the disbarment question may also be employed to determine the level of a suspension or other sanction.
A review of the common law tort of conversion has aided our recognition and articulation of the factors used by this court in disciplinary decisions involving the mishandling of clients' funds. Although we do not adopt these tort rules for the purpose of determining when a disciplinary rule has been violated, the problem of deciding whether an interference with property is serious enough to amount to a conversion is similar to the question of whether a misappropriation of a client's funds warrants disbarment or suspension. Indeed, in many cases the significant factors are identical. Accordingly, a brief analysis of the judicial process in the field of conversion is helpful to an understanding of disciplinary cases involving conversion and commingling of client funds.
Since the 1800's the tort of conversion has been limited to those major interferences with a chattel, or with the plaintiff's rights in it, which are so serious, and so important, as to justify the forced judicial sale to the defendantthis forced sale is the distinguishing feature of the action. In determining the seriousness of the interference, the factors considered include the extent and duration of the defendant's exercise *121 of control over the chattel, his intent to assert a right which is in fact inconsistent with the plaintiff's right of control, the defendant's good faith or bad faith, the extent and duration of the resulting interference with the plaintiff's right of control, the harm done to the chattel, and the expense and inconvenience caused to the plaintiff. W. Prosser & W. Keeton, Torts, § 15 at 90 (5th ed. 1984); Prosser, The Nature of Conversion, 42 Corn.L.Q. 168, 173-74 (1957); Salmond, Observations on Trover and Conversion, 21 L.Q.Rev. 43 (1905); see generally Restatement 2d, Torts, § 222(A) et seq.
The intent required for a conversion is not necessarily that of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. A mistake of law or fact is no defense. Persons deal with the chattels or exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts. W. Prosser & W. Keeton, supra, § 15 at 92-93; Prosser, supra, at 171.
When the defendant initially acquires the chattel by a wrongful act, e.g., by theft or fraud, the taking itself is wrongful, and the tort is complete without any demand for the return of the goods. However, not every unauthorized taking of goods from the possession of another is sufficiently serious to amount to conversion. The intention may be good, the duration brief, the event harmless; and if so, the severe remedy of the forced sale to the defendant will not be applied. If A takes B's hat from a rack in a restaurant, immediately discovers his mistake, and returns the hat, there is clearly no conversion. If he takes the hat intending to steal it, or if he keeps it six months, or if a sudden gust of wind blows it off his head into an open manhole and it is lost, the interference with the rights of the owner becomes sufficiently serious to amount to conversion. W. Prosser & W. Keeton, supra, § 15 at 92-93; Prosser, supra, at 174-77.
Another common way in which conversion may occur is a refusal to surrender possession of a chattel to one who is entitled to it. Where there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort. When demand is made, an absolute, unqualified refusal to surrender, which puts the plaintiff to the necessity of force or a lawsuit to recover his own property, is of course a conversion. Denial of possession, equivocation, or a lying promise to return, or even continued silence and inaction for several days, may amount to the same thing. W. Prosser & W. Keeton, supra, § 15 at 99; Prosser, supra, at 180-82.
The tort theory of conversion cannot be used to determine whether an attorney has violated the disciplinary rules. Conversion is restricted to those major interferences which are so serious, and so important, as to justify the drastic remedy of a forced judicial sale, while professional rule violations may range from a minor infraction justifying no more than an informal reprimand to a breach that is grounds for disbarment. Conversion doctrine is useful in determining the sanction to impose in disciplinary cases, however, because the type of detriment imposed frequently depends on the same factors deemed important in conversion cases.
Under the disciplinary rules adopted by this court, a lawyer must deposit all funds of clients and funds belonging in part to a client and in part presently or potentially to himself in an identifiable clients' trust account separate from his operating account. A lawyer may not deposit his own funds in the trust account except for amounts reasonably sufficient to pay bank charges. The lawyer's portion of any joint funds may not be withdrawn unless the amount is due and undisputed. If requested by a client, a lawyer must pay or deliver to the client funds, securities, or other properties in the possession of the lawyer which the *122 client is entitled to receive.[1] DR 9-102, La.Code of Professional Responsibility.
Accordingly, an attorney violates DR 9-102 when he (1) fails to deposit funds wholly or partially belonging to his client in a separate clients' trust account, (2) withdraws funds from the clients' trust account which are not due him beyond any dispute, or (3) fails to deliver to his client as requested funds which the client is entitled to receive.[2] See DR 9-102, La.Code of Professional Responsibility. The attorney's mistake, good faith or lack of conscious wrongdoing may mitigate the offense, but does not negate the infraction. In determining the seriousness of the violation as a reflection of the moral character of the attorney, his state of mind and all other relevant factors in the case must be considered.
Hinrichs clearly violated DR 9-102 by causing client funds which were not due to him to be withdrawn and used for his own benefit. He also breached the rule by his failure to deliver to Revere funds that Revere was entitled to receive upon request. The attorney violated the spirit if not the letter of the rule by placing his client's funds in an account that was not secure and insulated from the vicissitudes of his own financial affairs. That Hinrichs did not intend the disastrous consequences to his client or did not act in bad faith is not a defense, but may be considered in determining an appropriate sanction.
Because of our concern over inconsistencies among previous sanctions we have imposed for violations of DR 9-102, we will attempt to set forth some general guidelines for evaluating this kind of disciplinary case. These guidelines consist of flexible classifications of typical DR 9-102 violations. The attributes of each category have been suggested by our previous opinions, the common law of conversion and the goals of lawyer discipline. Because disciplinary sanctions ultimately depend upon this court's evaluation of each attorney's moral character, however, a disbarment or suspension should not be imposed mechanically. Because of the compound difficulty in deciding and writing about such a subjective question, there will always be a degree of real or seeming inconsistency among disciplinary cases. Our objective is not to make a science of lawyer corrections, but only to approach more nearly the goal of justice in treating like cases alike.
In a typical case of disbarment for violation of DR 9-102, one or more of the following elements are usually present: the lawyer acts in bad faith and intends a result inconsistent with his client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of damage, expense and inconvenience caused the client is great; the lawyer either fails to make full restitution or does so tardily after extended pressure of disciplinary or legal proceedings. See Louisiana State Bar Association v. Hickman, 471 So.2d 696 (La.1985); Louisiana State Bar Association v. Atkins, 440 So.2d 106 (La.1983); Louisiana State Bar Association v. Armagnac, 424 So.2d 996 (La.1982); Louisiana State Bar Association v. Jordan, 375 So.2d 89 (La.1979); Louisiana State Bar Association v. Philips, 363 So.2d 667 (La.1978); Louisiana State Bar Association v. Weysham, 307 So.2d 336 (La.1975).
A three year suspension from practice typically results in cases involving similar but less aggravated factors. In such cases the lawyer is guilty of at least a high *123 degree of negligence in causing his client's funds to be withdrawn or retained in violation of the disciplinary rule. He usually does not commit other fraudulent acts in connection therewith. The attorney usually benefits from the infraction but, in contrast with disbarment cases, the client may not be greatly harmed or exposed to great risk of harm. The attorney fully reimburses or pays his client the funds due without the necessity of extensive disciplinary or legal proceedings. See Louisiana State Bar Association v. Wilkins, 449 So.2d 1011 (La.1984); Louisiana State Bar Association v. Daye, 427 So.2d 840 (La.1983) (three year suspension imposed despite forgery and bad faith; but sanction was mitigated by undue delay in disciplinary proceedings); Louisiana State Bar Association v. Stinson, 368 So.2d 971 (La.), cert. denied, 444 U.S. 1073 (1979).
A suspension from practice of eighteen months or two years will typically result where the facts are appropriate for a three-year suspension, except that there are significant mitigating circumstances; or where the facts are appropriate for a one-year suspension, except that there are significant aggravating circumstances. See Louisiana State Bar Association v. Perez, 471 So.2d 685 (La.1985); Louisiana State Bar Association v. Whittington, 459 So.2d 520 (La.1985).
A suspension from practice of one year or less will typically result where the negligence in withdrawing or retaining client funds is not gross or of a high degree. No other fraudulent acts are committed in connection with the violation of the disciplinary rule. There is no serious harm or threat of harm to the client. Full restitution is made promptly, usually before any legal proceeding or disciplinary complaint is made. See Louisiana State Bar Association v. Hopkins, 447 So.2d 464 (La.1984); Louisiana State Bar Association v. Adams, 368 So.2d 694 (La.1979).
A reprimand may be appropriate in a case where there is a minor violation of DR 9-102, but there is no conversion or harm to the client. See Louisiana State Bar Association v. Mitchell, 375 So.2d 1350 (La.1979).
The facts of this case involve most of the factors contained in the three-year suspension category outlined above. Hinrichs was grossly negligent in his treatment of his client's funds. No other fraudulent acts were committed in connection with the conversion. Hinrichs benefitted from the infraction by the payment of his personal debt from the funds in his clients' trust account. The client was seriously injured in his day-to-day living and in his dealings with creditors. Hinrichs fully repaid his client, with damages, but only after several months had elapsed, a civil suit had been filed, a complaint lodged with the bar association, and a complaint made to the district attorney's office. Hinrichs has been practicing law for thirty-two years, and has been the subject of at least sixteen prior complaints to the bar association four of these complaints resulted in public or private reprimands. None involved commingling or conversion of client funds. Under these circumstances, we do not think that Hinrichs should be adjudged to be morally unfit to continue in the practice of law. The violation is serious, however, reflecting a need for a substantial suspension to correct the attorney and further the other disciplinary goals. Upon our further review, we conclude that a three-year suspension from the practice of law would have been appropriate. However, since only the respondent applied for a rehearing, and the bar association did not, we will not increase the sanction imposed on original hearing.
Accordingly, the original decree is reaffirmed: It is ordered, adjudged, and decreed that Wilmer G. Hinrichs be suspended from the practice of law for two years from the date of finality of this judgment, at respondent's cost.
ATTORNEY SUSPENDED TWO YEARS.
BLANCHE and LEMMON, JJ., concur and assign reasons.
MARCUS, J., concurs in the result.
*124 BLANCHE, Justice (concurring).
This writer is of the opinion that the Court should, in the interest of justice, strive for uniformity in imposing punishment for violations of disciplinary rules as much as possible. As the opinion notes "our objective is not to make a science of lawyer corrections, but only to approach more nearly the goal of justice in treating like cases alike." This writer views the categorizing of misconduct and extenuating circumstances as a useful tool in the determination of guidelines for appropriate sanctions. While such guidelines may be helpful, they should not be used as a device to ameliorate this Court's duty to take into consideration the peculiar facts and circumstances of each case.
LEMMON, Justice, concurring.
The majority opinion commendably seeks to establish guidelines for evaluating the sanction to be imposed in disciplinary cases involving an attorney's conversion of a client's funds to his own use. I agree generally with the classifications, but disagree that this case falls in the three-year suspension category. There was no evidence of any pattern of commingling or conversion of clients' funds or of any attempt to deceive the client. While the improper withdrawal from the trust account was intentional, the effect on this particular client's funds was merely negligent. Respondent wrote the postdated check long before the settlement of the Revere case, at a time when there was no expectation that the Revere case would be settled in the near future. There were sufficient funds in the bank when respondent wrote the client's check, and it was only fortuitous that the postdated check cleared the bank before the client's check on October 29. Respondent cannot be said to have intentionally converted this client's funds to cover the postdated check.
When his previous misconduct in writing the postdated check on the trust account caused the unintended result, respondent disclosed the problem immediately and made a partial payment. He eventually (although not promptly) paid the full amount, plus $3,500 in damages.
Because of these substantial mitigating circumstances, I would place this case in the eighteen-month to two-year suspension category at worst and therefore concur in the two-year suspension. I strongly disagree, however, with according any consideration whatsoever to any complaints which did not result in a reprimand, suspension or disbarment. Evidence of the mere fact of a complaint is incompetent and inadmissible.
NOTES
[1] In addition, a lawyer must promptly notify a client of the receipt of his funds, securities, or other properties; identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable; and maintain complete records of all funds, securities, and other properties of a client coming into possession of the lawyer and render appropriate accounts to his client regarding them. DR 9-102(B), La.Code of Prof.Resp.
[2] These are the violations which this court has loosely called "commingling" and "conversion," but they are not the only ways that an attorney may violate DR 9-102. See note 1, supra.