538 So.2d 256 (1989)
LOUISIANA STATE BAR ASSOCIATION
v.
Charles H. WHITE.
Nos. 87-B-0929, 88-B-0058.
Supreme Court of Louisiana.
January 30, 1989.
Thomas O. Collins, Jr., G. Fred Ours, New Orleans, Gerard F. Thomas, Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pé, Metairie, Trevor G. Bryan, Elizabeth A. Alston, New Orleans, and Christine Lipsey, Baton Rouge, for applicant.
Charles White, Lolis E. Elie, and Robert S. Glass, New Orleans, for respondent.
MARCUS, Justice.
The Louisiana State Bar Association, through its Committee on Professional Responsibility, instituted two proceedings against Charles H. White, a member of said association. Prior to the commencement of each proceeding, the committee had conducted investigations of respondent's alleged misconduct in accordance with article 15, section 3 of the articles of incorporation of said association.
Notice of the first proceeding, No. 87-B-0929, which involved one specification of misconduct, was sent to respondent by certified mail dated January 28, 1987. The committee held a formal investigative hearing on March 5, 1987, as provided in article 15, section 3(b) of the articles of incorporation. Respondent was present at the hearing, was represented by counsel and testified on his own behalf. Based on the evidence adduced at this hearing, the committee, by a unanimous vote, was of the opinion that respondent had been guilty of a violation of the laws of this state relating to the professional conduct of lawyers and *257 to the practice of law of sufficient gravity as to evidence a lack of moral fitness for the practice of law; that, specifically, respondent was guilty of misconduct as described in Specification No. 1. On April 24, 1987, the committee instituted in this court a suit for disciplinary action against respondent under the provisions of article 15, section 4(c) of the articles of incorporation. Respondent did not file an answer to the petition. The court, by order, appointed Larry C. Becnel as commissioner to take evidence and file a report with this court setting forth his findings of fact and conclusions of law. Louisiana State Bar Association Articles of Incorporation, article 15, section 6(b) and (d). Hearings before the commissioner were held on November 19, December 8 and December 17, 1987. Respondent was present and represented by counsel. The committee introduced in evidence the entire record of disciplinary proceedings, including the original pleadings filed into the record and the transcript and original exhibits from the committee hearing, as well as other exhibits. Two witnesses who testified at the committee hearing also testified before the commissioner. Respondent presented several character witnesses and testified on his own behalf.
The committee notified respondent of the second proceeding, No. 88-B-0058, involving one specification of misconduct, by certified mail dated August 31, 1987. The committee conducted the formal investigative hearing on December 15, 1987. Respondent was present and represented by counsel. Based upon the evidence adduced at this hearing, the committee, by a unanimous vote, was of the opinion that respondent had been guilty of a violation of the laws of this state relating to the professional conduct of lawyers and to the practice of law of sufficient gravity as to evidence a lack of moral fitness for the practice of law; that, specifically, respondent was guilty of misconduct as described in Specification No. 1. On January 8, 1988, the committee instituted in this court a suit for disciplinary action against respondent under the provisions of article 15, section 4(c) of the articles of incorporation. Respondent answered the petition. The court also appointed Larry C. Becnel commissioner in this proceeding and consolidated it with the prior proceeding. Hearings before the commissioner were held on April 21 and May 11, 1988. The committee introduced in evidence the entire record of disciplinary proceedings, including the original pleadings filed in the record and the transcript and exhibits from the committee hearing whereupon the committee rested its case subject to its right of cross-examination and rebuttal. Respondent was present, was represented by counsel and testified on his own behalf.
The commissioner filed with this court his written report on August 8, 1988, wherein he stated his findings of fact and conclusions of law and recommendation that respondent be reprimanded. The committee concurred with some of the commissioner's findings but opposed others. It opposed the commissioner's recommendation as to discipline and recommended to this court that respondent be suspended from the practice of law for a period of eighteen months. After oral argument before this court, the consolidated proceedings were submitted for our determination on the record before the commissioner.

No. 87-B-0929
Specification No. 1 alleged:
That in your capacity as Attorney at Law, you were retained in 1984 to represent one Sarah McCullough Love in a matter involving the death of her daughter, Mary Louise Pool. That in connection with that representation, you did open tutorship proceedings in the Civil District Court for the Parish of Orleans under docket number 84-7154 and you did open the Succession of Mary Louise Pool, number 84-7153 on the docket of the Civil District Court for the Parish of Orleans. That between July 3, 1984 and August 13, 1984, you did receive and deposit into your trust account proceeds in the amount of $5,000.00 in the tutorship proceeding and proceeds in the amount of $38,074.15 in the succession proceedings. That on July 3, 1984, you did deposit into your trust account the *258 sum of $9,000.00 relating to the above matters and that on August 13, 1984, you did deposit the sum of $34,074.15 in the above described matters. That on or about December 17, 1985, you were notified by Sara McCullough Love through her new counsel that she had hired new counsel and that you were being discharged from the representation of her as both the administratrix of the succession and the tutrix of the minors in the tutorship proceeding. You were further notified on or about December 17, 1985 that an accounting of the $43,074.15 was requested of you. That you did fail, neglect, or refuse to account for said funds until on or about March 12, 1986 when you did file motions to deposit funds in the Registry of the Court and to withdraw as counsel and attorney's accountings for funds in the tutorship and succession matters. That pursuant to these motions, you did deposit into the Registry of the Court the sums of $4,220.00 in the tutorship proceeding and the sum of $29,555.61 in the succession proceeding. That you have failed, neglected, and refused to make a timely accounting of funds to your client and have failed to promptly turn over funds entrusted to you subsequent to your discharge. That in the course and scope of your handling of the tutorship and succession matters, you have disbursed funds without proper authorization of the Court; that you have failed to maintain the funds received by you in trust in an identifiable trust account and have in fact commingled and converted funds to your one [sic] use; all in violation of Disciplinary Rules DR 1-102(A)(4)(5)(6)[[1]] and DR 9-102[[2]] of the Code of Professional *259 Responsibility of the Louisiana State Bar Association.
Respondent was retained by Mrs. Love to assist her in obtaining life insurance proceeds on her daughter, Mary Louise Pool, who was shot by her husband who then killed himself. She was survived by three minor children. Mrs. Love agreed in writing to pay respondent one-third of the amount collected if there was a dispute involved in the collection of the two policies. There was a dispute over the beneficiary of the larger policy on Mrs. Pool and respondent succeeded in having Mrs. Pool's estate, rather than her husband's, named as beneficiary and also succeeded in obtaining double indemnity on the policy.[3] The total recovery under this policy was $34,074.15. Recovery under the smaller policy was $9,000.00. Respondent also represented Mrs. Love in a contested custody proceeding in which he succeeded in having Mrs. Love named as the custodian of the three minor children. Respondent opened tutorship and succession proceedings in the Civil District Court for the Parish of Orleans in 1984.
He obtained proceeds from the insurance policies totaling $43,074.15 which were deposited into respondent's trust account in July and August of 1984. Between August 1984 and December 1985, respondent advanced monies to Mrs. Love for expenditures on behalf of the minor children and the estate totaling $12,405.55. Respondent admits that he did not obtain court approval for any of these disbursements. Mrs. Love retained new counsel in December of 1985. Her new attorney wrote two letters to respondent on behalf of Mrs. Love discharging him as attorney and requesting an accounting in both the succession and tutorship proceedings. The first letter was received by his office on or about December 17, 1985. Respondent testified that he was out of town at that time and did not become aware of the letter until early January. The second letter arrived on or about January 14, 1986. Respondent deposited $33,775.61 in the registry of the court on March 12, 1986 after deducting his fee of $8,518.54 and court costs of $780.00 from the total insurance proceeds of $43,074.15 along with accountings in the succession and tutorship proceedings. He also filed a motion to withdraw as counsel. Respondent admitted and his trust account statements reflect that from August 1984 to March 1986 he often did not have sufficient funds in his trust account to cover monies owed to his client.[4]
Respondent testified that he was unaware that Mrs. Love was dissatisfied with his work until he received a letter from her new attorney informing him that he had been discharged. He alleges that he spent more than three hundred hours on her case. He explained that he did not render *260 an accounting or turn over the funds immediately because he wanted to contact two of the Pool children in Natchez, Mississippi who had become majors. After personally meeting with them, they told respondent they were not represented by Mrs. Love's new counsel. Respondent alleges that after communicating with Mrs. Love's new attorney, he prepared an accounting, collected outstanding fees owed him from other clients in order to obtain the funds, and deposited these funds totaling $33,775.61 into the registry of the court on March 12, 1986.

No. 88-B-0058
Specification No. 1 alleged:
That in your capacity as Attorney at Law, you were retained to represent the interest of one Ronald H. West in a matter involving personal injury. That on or about November of 1984, Mr. West's case was settled for the sum of $300,000.00. That you did receive checks and/or drafts for the $300,000.00 which were deposited into your trust account on or about December 11, 1984. That after deduction of your fee and expenses, the client's portion of this settlement was approximately $166,972.47. That disbursement of these funds to the client was made in seven different installments between December 10, 1984 and May 21, 1986. That you have failed, neglected, and refused to render a prompt and accurate accounting to your client; that you have failed, neglected, and refused to promptly turn over to your client the sums of money to which he was entitled; that you have failed, neglected, and refused to pay out the expenses of the lawsuit as directed by your client; that you have commingled funds belonging to a client with funds of your own and that you have converted funds belonging to a client to your own use; all in violation of Disciplinary Rules DR 1-102(A)(4)(5)(6) and DR 9-102(A)(B)(3)(4) of the Code of Professional Responsibility of the Louisiana State Bar Association.[[5]]
Respondent was retained by Mr. West in 1979 in a personal injury matter. Mr. West had previously been represented by another attorney, Mr. McKee. After negotiations, respondent settled the case in December of 1984 for $300,000.00. Respondent testified at the commissioner's hearing that he intended to pay all bills and costs (about $12,500.00), deduct his professional fee of $120,000.00 (forty percent of settlement) pursuant to his contract with Mr. West, and disburse the remaining sum of about $167,500.00 to his client. However, as per instructions from Mr. West, respondent paid the outstanding bills and kept the client's portion of the settlement in his trust account because Mr. West was in the process of moving his family from Louisiana to Alabama and did not want to open a bank account in Louisiana. Mr. West also requested that respondent retain $10,000.00 of his settlement fee to cover expenses incurred in the contract dispute with his former attorney, Mr. McKee, and Mr. West retained Okla Jones to represent him in that matter. Between December 1984 and September 1985, respondent made disbursements to Mr. West at his request.[6] In October of 1985, there remained about $11,000.00 of Mr. West's funds in respondent's trust account ($10,000.00 of which was retained for the McKee dispute). In early 1986, respondent received a letter from Mr. West requesting the balance of his funds and an accounting. This was followed by two letters in April and May of 1986 from an attorney in Alabama retained by Mr. West. On May 21, 1986, respondent sent a check for $9,500.00 to Mr. West and his new attorney and stated that an accounting would be forthcoming shortly. That letter also stated that respondent was waiting for Okla Jones to finalize the claim with Mr. McKee. Respondent then took it *261 upon himself to settle the dispute with Mr. McKee, paid $1,500.00 to McKee as settlement in the matter on June 2, 1986, and took no fee for himself or Okla Jones, leaving a balance due Mr. West of $27.53. A final and detailed accounting was sent to Mr. West on February 23, 1987. Statements of respondent's trust account during his representation of Mr. West reveal that at most times there were insufficient funds to cover the sum owed to Mr. West.[7]
Respondent admits that he used the Love and West funds from his trust account for disbursements in those matters as well as for general office and personal purposes and depleted the trust account as the need arose. In defense of his conduct, respondent contends that he was not aware that he was required to do anything more than produce his clients' money upon demand and make sure that he accounted for the funds he had in trust for his clients and pay them over upon request. Respondent testified that when he attended Southern University Law School, ethics was not taught and his mentor (a lawyer with whom he was first associated) had maintained a single trust account for both law office administration and client funds. Respondent further testified that he did not intend at any time to deprive his clients of their funds and explained that at no time were their funds in jeopardy because he had the ability at all times to obtain their funds from other personal sources including bonds, certificates of deposit and a $50,000.00 line of credit at Liberty Bank and from outstanding fees owed him by several large clients. Evidence of these other sources was introduced at the hearings. Respondent also testified that during 1984-1986, he was working long hours on some big cases and delegated responsibility for overseeing his office administration to an ever-changing secretarial staff. His office was also subject during this time to constant associate turnover. In early 1985, his secretary pled guilty to forgery of checks drawn on respondent's trust account; however, he never determined the amount of the theft or even attempted to recover the monies.
We find that the record fully supports the conclusion that respondent commingled and converted his clients' funds in both the Love and the West matters by depositing clients' funds into a single account used as both a trust account and as an operating account for his law office and allowing the balance of the account to fall below amounts owed to the clients. Further we find that in the Love matter, respondent disbursed funds in the succession and tutorship proceedings without court authorization and failed to promptly turn over funds entrusted to him subsequent to discharge; and in the West matter, he failed and neglected to promptly turn over client funds and render an accounting. The above conduct in the Love and West matters constitutes violations of DR 1-102(A)(5), (6) and DR 9-102 and 9-102(A), (B)(3), (4), respectively. However, respondent did not violate DR 1-102(A)(4) in either matter. Thus, the remaining issue for us to determine is the appropriate discipline to be imposed.
The purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession and to deter other lawyers from engaging in violations of the Code of Professional Responsibility. The discipline to be imposed will depend upon the seriousness of the offense involved and the facts and circumstances of each case. The court will take into account both aggravating and mitigating circumstances. Louisiana State Bar Association v. Hayling, 529 So.2d 1 (La.1988); Louisiana State Bar Association v. Thalheim, 504 So.2d 822 (La.1987).
*262 Respondent graduated from Southern Law School in 1966. At the time he attended Southern, the law school offered no courses in ethics or professional responsibility. For the first nine years of his practice, respondent worked for various public agencies and had nothing to do with clients, client funds or administration of a law office. Respondent contends that when he entered private practice, he learned from his mentor that the essence of an ethical practice was not to segregate client funds from his personal or office funds but only to ensure that there was always enough money available to pay his client obligations. Since the commencement of these disciplinary proceedings, respondent has taken steps to prevent similar misconduct by establishing a trust account for client funds separate from his office account, improving his office accounting practices, and by attending seminars on continuing legal education.
While respondent was guilty of the misconduct of commingling and conversion in both matters, we find that there was clearly no intent on his part to permanently deprive either client of funds and at no time were client funds seriously at risk since respondent demonstrated that he had adequate personal funds with which to pay his clients. Respondent's conduct did not involve fraud, deceit or misrepresentation but at most only negligence in failing to render prompt accountings and to promptly turn over funds. In the Love matter, Mrs. Pool's estate and the children received the full amount of insurance proceeds ($33,775.61) after respondent deducted his fee of $8,518.54 and costs of $780.00. Moreover, even though respondent made advances to Mrs. Love and paid expenditures on behalf of the estate totaling $12,405.55, he declined to file a claim against the estate for this sum. Thus, respondent actually paid out about $4,000.00 more than he took in fees. Respondent testified that he thought it fair for him to pay a penalty for commingling the funds and for any loss of interest the Pool children had suffered by his failure to put the funds in an interest-bearing account. In the West matter, respondent received a settlement of $300,000.00 in December of 1984, about $167,500.00 of which belonged to his client, and deposited the sum in his trust account. Mr. West instructed respondent to retain the funds until requested by him. Over the next nine months, respondent made disbursements to Mr. West at his request, and by September 1985, there remained only about $11,000.00 of the $167,500.00 in his account, with $10,000.00 being retained for settlement of the McKee matter. Respondent paid out Mr. West's funds as requested, dealt with the McKee matter gratuitously and rendered a finalized and detailed accounting, disbursing the remaining $27.53 belonging to Mr. West in February 1987. Neither Mrs. Love nor Mr. West was financially harmed by respondent's misconduct. Many attorneys, judges and professors testified to respondent's moral character, integrity, dedication to the profession, community service, devotion to family and his unqualified fitness to practice law. Respondent has admitted his guilt and is remorseful for his conduct and any inconvenience he has caused his clients and the Bar Association. He has cooperated with the committee's proceedings. Moreover, respondent has initiated office procedures that should prevent the commingling of client funds in the future. Respondent had three prior private reprimands involving failure to disburse succession funds, to render a prompt accounting, to promptly pay medical fees and neglect of a legal matter. They occurred at about the same time as the misconduct involved in these proceedings. Given respondent's efforts to administer his practice more efficiently in the future, we feel that they should not recur.
While we find respondent's misconduct to be of sufficient gravity to warrant disciplinary action, under the circumstances, we consider a three-month suspension from the practice of law to be an appropriate penalty. See Louisiana State Bar Association v. Marinello, 523 So.2d 838 (La. 1988); Louisiana State Bar Association v. Thalheim, supra.

DECREE
For the reasons assigned, it is ordered, adjudged and decreed that Charles H. *263 White be suspended from the practice of law in Louisiana for three months from the date of finality of this judgment. Respondent is to bear all costs of these proceedings.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
The absence of deception and dishonesty in respondent's use of clients' funds, which were never at risk of loss, might otherwise justify consideration of a reprimand with a period of probation. However, the three prior reprimands for the same misconduct warrant a suspension of three to six months.
NOTES
[1] DR 1-102 provides in pertinent part:

(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
[2] DR 9-102 provides:

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank or insured depository institution accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
(C) A Lawyer may elect to create and maintain an interest-bearing trust account for clients' funds which are nominal in amount or to be held for a short period of time in compliance with the following provisions:
(1) No earnings from such an account shall be made available to a lawyer or firm.
(2) The account shall include all clients' funds which are nominal in amount or to be held for a short period of time.
(3) Any interest-bearing trust account may be established with any bank or savings and loan association or credit union authorized by federal or state law to do business in Louisiana and insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation or the National Credit Union Administration. Funds in each interest-bearing trust account shall be subject to withdrawal upon request and without delay.
(4) The rate of interest payable on any interest-bearing trust account shall not be less than the rate paid by the depository institution to regular, nonlawyer depositors.
(5) Lawyers or law firms electing to deposit client funds in a trust savings account shall direct the depository institution:
a. To remit interest or dividends, net of any service charges or fees, on the average monthly balance in the account, or as otherwise computed in accordance with an institution's standard accounting practice, at least quarterly, to the Louisiana Bar Foundation, Inc.;
b. To transmit with each remittance to the Foundation a statement showing the name of the lawyer or law firm for whom the remittance is sent and the rate of interest applied; and
c. To transmit to the depositing lawyer or law firm at the same time a report showing the amount paid to the Foundation, the rate of interest applied, and the average account balance of the period for which the report is made.
The Code of Professional Responsibility was replaced by the Rules of Professional Conduct, effective January 1, 1987. The alleged violation in this case occurred before the effective date.
[3] Mrs. Pool's husband shot her to death and then turned the pistol on himself and shot himself in the head. After hiring a consultant, respondent convinced the coroner to re-write the times of the Pools' deaths to show that Mr. Pool predeceased his wife (she was shot through the heart, dying more slowly than he from the gunshot to the head), and thus her estate, and not his, was the beneficiary of the policy.
[4] Between August 1984 and March 1986, respondent's trust account balance fluctuated as follows:

Statement Amount Owed Trust Account
Date Mrs. Love Balance
8/31/84 $33,775.61 $15,793.37
9/12/84 33,775.61 2,023.86
10/31/84 33,775.61 104.26
11/30/84 33,775.61 (-)733.33
2/28/85 33,775.61 30,890.89
3/29/85 33,775.61 5,943.77
11/29/85 33,775.61 287.86
1/31/86 33,775.61 389.11
2/28/86 33,775.61 85.63

[5] Supra notes 1 and 2.
[6] Respondent made the following disbursements to Mr. West at his request between December 1984 and September 1985:

December 1984 $10,000.00
December 1984 $17,424.62
January 1985 2,575.38
January 1985 125,000.00
February 1985 1,500.00
September 1985 1,000.00

[7] Between December 1984 and March 1986, respondent's trust account balance fluctuated as follows:

Statement Funds Due Trust Account
 Date West Balance
12/31/84 $139,547.82 $222,377.12
 3/29/85 11,972.44 5,943.77
10/31/85 $10,972.44 $ 291.47
11/29/85 10,972.44 287.86
12/31/85 10,972.44 1,590.57
 1/31/86 10,972.44 389.11
 2/28/86 10,972.44 85.63