DISCIPLINARY PROCEEDINGS
WATSON, Justice.
The Louisiana State Bar Association instituted these consolidated disciplinary proceedings against attorney Overton C. Thi-erry, whose license to practice law is currently under a three year suspension. The Louisiana Supreme Court has original jurisdiction. LSA-Const. art. V, § 5(B).
Thierry was suspended for three years because of his failure to render a prompt accounting to clients, failure to deposit funds into an identifiable trust account, failure to make timely payments on his clients’ behalf, and negligent commingling and conversion of client funds. Louisiana State Bar Association v. Thierry, 520 So.2d 410 (La.1988). In 1978, Thierry was disbarred because of federal convictions for conspiracy against the United States and subornation of perjury. See Louisiana State Bar Association v. Thierry, 366 So.2d 1305 (La.1978).
Thierry is charged with twelve specifications of misconduct involving seven clients. Most of the charges arose in 1985 and 1986, at the same time as the misconduct for which he is currently under suspension. Those charges are governed by the former Code of Professional Responsibility. Two other matters, which extended into 1987, are governed by the Rules of Professional Conduct effective January 1, 1987.
Thierry objected to the appointment of Frederick S. Kullman as Commissioner in No. 88-B-0430 because Kullman’s brother was a law partner of one of the Bar Association members who conducted the preliminary hearings. Kullman noted that this is not a ground for recusal of judges in LSA-C.C.P. art. 151, stated that he was free from any bias, and refused to recuse himself. A different Commissioner was appointed to hear No. 88-B-2079. Both Commissioners recommend disbarment. The Bar Association’s Disciplinary Counsel also recommends disbarment.

Specifications of Misconduct

The twelve specifications of misconduct involve the following clients: Reginald T. Brown, Clyde Crump, Frank Williams, Connie Carter, Pamela Myers, James Simmons, and Rose Francis.

*1101
Reginald T Brown

On August 1, 1985, American General Companies issued a $1,950 check payable to “Reginald T. Brown c/o Mr. Overton C. Thierry” in settlement of Brown’s property damage claim from an automobile accident. On October 31, 1985, Thierry issued Brown a $1,460 check drawn on his trust account, which was returned for nonsufficient funds. Brown sent a complaint to the Bar Association on December 6, 1985. Thierry paid $1,460 in cash to redeem the check sometime in 1986.
Thierry claims that he represented another client named Reginald Brown; that he notified the wrong Reginald Brown; and that the wrong Reginald Brown’s wife endorsed the check for cash at Thierry’s office. When Thierry discovered that earlier payment, he stopped payment on the October 31, 1985, check by telephone. Thierry alleges that he did not discover there were two Reginald Browns until a complaint was filed when he promptly made restitution.
Thierry’s defense is negated by the “NSF” stamp on the returned check. This is unrebutted evidence that Thierry’s check was returned due to insufficient funds in his client trust account and not because payment was stopped on the check.
It was proven that Thierry commingled and converted client funds, failed to promptly account for client funds, and failed to turn over funds belonging to a client, violating Disciplinary Rules DR 9-102[1] and DR 1-102(A)(4), (5) and (6)[2] of the Code of Professional Responsibility of the Louisiana State Bar Association.

Clyde Crump

On May 9, 1985, Liberty Mutual Insurance Company issued checks totaling $6,096.68 to settle the automobile accident case of Clyde Crump. On June 11, 1985, Thierry paid Crump $3,687.77. However, there was no accounting to Crump until May 13, 1986, after Crump filed a complaint with the Bar Association. Crump later wrote the Committee to withdraw his complaint.
Although there was a delay of almost one year until the final accounting to Crump, Thierry did not charge Crump an attorney’s fee and paid Crump all the money due him. Thierry’s only proven misconduct was failure to render a prompt accounting, in violation of DR 9-102(B), supra.

Pastor Frank Ronald Williams

On August 26, 1985, State Farm Mutual Automobile Insurance Company issued a $25,000 settlement check payable to “Frank Williams and Overton Thierry, his attorney.” The check was deposited into *1102 Thierry’s trust account on September 4, 1985. On the same day, Thierry issued two checks to Mr. Williams, one for $2,000 and one for $3,000. On September 9, 1985, Williams executed a release discharging State Farm, but reserving his right to collect uninsured motorist coverage.
After State Farm issued the check, but before the release was executed, Williams told Thierry that he was still under medical treatment and was concerned about payment of those bills. Thierry assured Williams that he would pay the medical bills from the balance of the settlement, and reserve his legal fees until the uninsured motorist coverage was collected. However, Williams’ medical bills were not paid.
Williams continued to inquire about the unpaid bills and an accounting for the $25,-000 settlement. In early 1986, Williams received a handwritten accounting which contained incorrect and illegible entries purporting to show that Thierry had disbursed $16,352.88 in payment of medical bills. Despite a notation that Thierry had paid a Hotel Dieu hospital bill of $8,957.50, Hotel Dieu sued Williams for that amount. Thierry eventually paid the bill. Thierry claims that the handwritten document was an estimate of expenses in a continuing matter. In November of 1986, the uninsured motorist claim was settled for $35,-000, and Thierry accounted for the entire $60,000. In the interim, Thierry had issued NSF checks to: Dr. Edward C. Norman on March 10, 1986, for $970; Dr. Aris Cox on April 24, 1986, for $800; and McCune’s Pharmacy on May 14, 1986, for $96.35.
It was proven by clear and convincing evidence that Thierry commingled and converted his client’s funds; failed to render a prompt accounting; and failed to promptly pay funds due his client’s health care providers, in violation of DR 9-102 and DR 1-102(A)(4), (5) and (6), supra.

Connie Carter

Connie Carter retained Thierry to file a lawsuit in connection with a December 27, 1983 automobile accident. She contacted Thierry’s office repeatedly to determine the status of her suit, but never spoke to Thier-ry. Each time, Thierry’s secretary, identified as Sharon, assured Ms. Carter that a suit had been filed and that she would be notified when it was time to go to court. After Ms. Carter asked for a copy of her lawsuit, she received a letter dated December 4, 1985, with “the enclosed copy of the suit in your behalf.” The suit was never filed, and it prescribed.
Thierry produced a letter to Ms. Carter dated November 29, 1984, advising that he had drafted a lawsuit and investigated her claim, but could not help her; and that, if she wished to consult another attorney, she should do so by December 27, 1985. Ms. Carter denied receiving this letter, which was addressed to the wrong zip code, although she had received other correspondence from Thierry.
Neither Thierry nor Sharon testified to rebut Connie Carter’s contention that she was told a suit had been filed on her behalf. The December 4, 1985, letter could have removed any possibility of misunderstanding by stating that the enclosed petition had not been filed. The evidence is clear and convincing that Thierry neglected this legal matter, thereby violating DR 6-101(A)(3)[3].

Pamela Myers

A $3,000 settlement draft was issued to Pamela Myers and Thierry on May 19, 1986. Thierry deposited the draft into his trust account on May 30, 1986. On the same day, Thierry issued a $970.55 check to Ms. Myers. Ms. Myers was unable to cash Thierry’s check due to insufficient funds in Thierry’s account. Two weeks later, Ms. Myers’ father went to Thierry’s office, and Thierry redeemed the check with cash. Ms. Myers filed a complaint with the Bar Association on June 4, 1986, but could not remember whether the check was made good before or after she wrote the letter.
When Ms. Myer’s funds were deposited, they were immediately disbursed to pay *1103 other outstanding obligations, not leaving enough to cover Ms. Myers’ check. Thier-ry’s trust account had one check returned “NSF” on May 29, 1986; three checks returned “NSF” on May 30, 1986; three checks returned “NSF” on June 2, 1986; and two checks returned “NSF” on June 9, 1986. The bank’s records establish that Thierry had a higher dollar amount in outstanding checks than he had money in the bank. Thus, the inference of conversion from the NSF check was not rebutted.
The evidence is clear and convincing that Thierry commingled and converted Ms. Myers’ funds before restitution was made, in violation of DR 9-102 and DR 1-102(A)(3),[4] (4) and (6).

James Simmons, III

In late 1985, James Simmons, a resident of California, hired Thierry to handle some succession proceedings involving Louisiana real estate. Thierry allegedly gave Simmons two checks, one for $1,500 and one for $7,500, in anticipation of the future sale of the property. Simmons cashed the $1,500 check, but returned to Thierry’s office with the $7,500 check, claiming that the check was torn. Jacqueline Denise Armstrong, at that time a secretary in Thi-erry’s office, said she gave Simmons a new check on the petty cash account. Simmons also kept the torn check, which Armstrong thought was drawn on a different account. Thierry said that the torn check must have been a forgery, because he did not owe Simmons $7,500. Simmons admitted that the money was not owed to him and represented an advance.
Simmons returned to California and deposited a $7,500 check from Thierry in Security Pacific National Bank. The bank gave Simmons $1,978.53 but Thierry’s check was returned “NSF,” and the bank demanded that Simmons repay the money. When Thierry failed to make the check good, Simmons filed a complaint with the Bar Association on December 3, 1986. On February 19, 1987, Thierry sent the bank a cashier’s check for $1,978.53 to replace the funds advanced to Simmons. Thierry unsuccessfully attempted to get Simmons to withdraw his complaint.
Simmons did not testify at the Commissioner’s hearing. However, on the basis of his testimony at the Committee hearing, the Commissioner found that the Committee had proven by clear and convincing evidence that Thierry issued a check which he knew or should have known would be returned due to insufficient funds, thereby engaging in conduct involving deceit or misrepresentation, adversely reflecting upon his fitness to practice law, in violation of DR 1-102(A)(4) and (6), supra. The Commissioner also found that the Committee had proven by clear and convincing evidence that Thierry attempted to induce Simmons to provide false and misleading information, violating Rules 3.4(a) and (b)[5] and 8.4(a), (c) and (d).[6]
Thierry contends that the Commissioner erred in giving more weight to the testimony of Simmons, a convicted murderer, than that of Thierry and his two secretaries. Thierry also alleges that he would not have issued two checks for one advance, much less a $7,500 check drawn on a petty cash account.
It is highly improbable that Thierry would have advanced Simmons a $7,500 worthless check when Thierry did not owe *1104 Simmons any money. Since the scenario of Simmons’ complaint is no more likely than Thierry’s explanation, the misconduct regarding Simmons has not been proven by clear and convincing evidence.

Rose Kimble Francis

The details of Ms. Francis’ complaint against Overton Thierry are somewhat confused, partly because of Thierry’s failure to cooperate with the Committee’s investigation.
Ms. Francis had an accident on October 17, 1984, in which her car was hit by a government vehicle driven by a United States government employee, which placed the claim under the Federal Tort Claims Act. The General Services Administration settled the claim for $17,606.57 on May 15, 1987.
Ms. Francis was driving her son’s car. In the interim, Thierry collected $5,000 from her son’s insurance company, State Farm Insurance Company. The $5,000 check was deposited into one of Thierry’s various bank accounts on July 18, 1985. It was not deposited into Thierry’s trust account. Ms. Francis apparently did not endorse this check for deposit. Thierry rendered no contemporaneous accounting for the $5,000.
Overton Thierry had a one-third contingency fee agreement with Ms. Francis but a legal fee under the Federal Tort Claims Act is subject to a statutory limitation of twenty-five percent if suit is filed and twenty percent if suit is not filed. Thierry claims ignorance of the statute but contends, correctly, that the fee charged Ms. Francis was less than the maximum authorized by the statute.
While the Francis matter was pending in this court, Thierry filed a motion to remand to the Commissioner for the taking of additional evidence and the filing of an affidavit and exhibits. The motion to remand was denied but Thierry was allowed to file the affidavit and exhibits. Thierry attested that he had recently obtained his Francis file and, therefore, was able to provide documentation which had previously been unavailable.
Thierry admits that he failed to deposit the $5,000 in a client trust account; failed to provide an accounting to his client; and failed to respond to the Committee's inquiries.
Although her testimony was somewhat confused, Rose Francis admitted receiving an advance check on November 27, 1984, of $1,000 and a check payable to Pendleton Methodist Hospital upon her admission to the hospital on May 19, 1985, of $1,350. Other documented expenses are as follows: Anesthesia East, Inc., May 22, 1985, $550; cashier’s check payable to Dr. Llewellyn as deposit on surgery, May 22, 1985, $1,000; December 19, 1984, check payable to Rose Francis, $135; check for Dr. Llewellyn’s operative report, $25; premium check to Reserve Life Insurance Company, September 12, 1985, $272; check to Ford Motor Credit Co. on behalf of Ms. Francis, $2,610; check payable to Rose Francis, $1,086.85; money order to Ford Motor Credit Co. on behalf of Ms. Francis, $8,171; and Department of Public Safety, $5.
Disciplinary Counsel asserts that all of Rose Francis’ medical bills were paid by her medical insurance company, Reserve Life Insurance Company, and, therefore, the checks to Anesthesia East, Dr. Llewellyn, and Pendleton Methodist Hospital either represented double payments or were refunded to Overton Thierry. However, the billing of Anesthesia East, Inc. shows a $550 credit on her bill in addition to the $810 that was paid by her insurer. There is no evidence that the other payments made by Overton Thierry to the hospital and to Dr. Llewellyn were not also additional payments which were not covered by her insurance. The Reserve Life Insurance Company statements do not show these credits but they also do not show the credit of $550 to Anesthesia East. The insurance records also show a deductible of $250 which was not paid by the medical insurance and $64 which was disallowed. It was not proven that Thierry received any refunds of the sums which were advanced for medical care.
The maximum legal fee on the Federal Tort Claims Act settlement of $17,606.57 was $3,521.31. In addition, Thierry was entitled to a one-third fee on the $5,000 collected from State Farm, or $1,666.50, for a total fee of $5,187.81.
*1105 The total of Rose Francis’ settlement was $22,606.57 and the attorney’s fee was $5,187.81, leaving a balance due of $17,-418.76. The documented expenses total $16,204.85, leaving a balance due of $1,213.91. Ms. Francis acknowledged receiving a settlement from Thierry of $4,253.85, more than she was owed. Rose Francis’ settlement check of $4,253.85, which she acknowledged receiving, is shown as a debit to Thierry’s trust account on July 14, 1987. The brief of the Bar Association’s Disciplinary Counsel completely ignores this payment in arguing that Thierry received an amount exceeding the statutory maximum under the FTCA.
Ms. Francis’ primary complaint was that she thought her case was worth $100,000 or more and she was disappointed in her eventual recovery.[7]
The only charges proven against Overton Thierry in connection with the complaint of Rose Francis were those he admitted, that is, failing to deposit the $5,000 draft from State Farm Insurance Company in his trust account, failing to account to his client for that amount, and failing to cooperate with the Committee. Thierry violated Rule 1.15(a), (b) and (c).[8]

Failure to Cooperate

Thierry is charged with failure to cooperate with the Committee’s investigation of the Myers, Simmons, and Francis matters. Thierry admitted failure to cooperate in the Francis matter. In the Myers investigation, Thierry failed to respond to two Committee letters and three requests for documentation. Thierry claims that his failure to cooperate did not impede the investigation. In the Simmons matter, Thierry' failed to respond to three notices of Simmons’ complaint. The evidence is clear and convincing that Thierry failed to cooperate with the Committee’s investigation of the Francis, Myers and Simmons matters. Thi-erry therefore engaged in conduct prejudicial to the administration of justice, adversely reflecting upon his fitness to practice law, violating DR 1-102(A)(5) and (6) and Rule 8.4(g).[9]

Conclusions

The purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer but rather to maintain appropriate standards of professional conduct, to safe *1106 guard the public, to preserve the integrity of the legal profession, and to deter other legal misconduct. The discipline imposed depends upon the seriousness of the offenses and the surrounding facts, considered with all aggravating and mitigating circumstances. Louisiana State Bar Association v. White, 538 So.2d 256 (La.1989); Louisiana State Bar Association v. Alker, 491 So.2d 1328 (La.1986).
The Bar Association has the burden of proving by clear and convincing evidence that an attorney is guilty of the alleged misconduct. Louisiana State Bar Association v. Dowd, 445 So.2d 723 (La.1984).
The evidence is clear and convincing that Thierry: knowingly issued NSF checks drawn on his trust account to Reginald Brown, Pamela Myers, and Frank Williams’ health care providers; failed to promptly deliver funds to Reginald Brown and Frank Williams; failed to render a prompt accounting to Reginald Brown, Clyde Crump, Frank Williams, and Rose Francis; failed to render an accurate accounting to Frank Williams; failed to promptly pay Frank Williams’ medical bills; neglected a legal matter by failing to timely file Connie Carter’s lawsuit; and commingled and converted the funds of Reginald Brown, Frank Williams, and Pamela Myers. These are all serious matters which caused injury or possible injury to his clients.
Aggravating factors are present. Thier-ry was the subject of two prior disciplinary actions. He has been both disbarred and suspended. He is currently under suspension, has been involved in multiple offenses, and has shown a pattern of misconduct. His failure to cooperate with the Committee’s investigations and substantial experience in the practice of law are further aggravating factors. Although Thier-ry has made restitution to all of his clients, he did so in most cases only after complaints were filed. See ABA Standards for Imposing Lawyer Sanctions § 9.22 (1986). According to the guidelines in Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La.1986), disbarment is appropriate when there is a violation of DR 9-102 involving client injury, fraudulent acts, and tardy restitution.
Except for the Williams and Francis matters, Thierry’s misconduct occurred at the same time as the offenses for which he is under suspension. The appropriate question is: “If all of the matters [had been presented] simultaneously, what would [be] the appropriate discipline?” In re Thompson, 492 A.2d 866, 867 (D.C.App.1985). If this court had been previously presented with the misconduct proven in the' present action, it would have revoked Thierry’s license to practice law. See Louisiana State Bar Association v. Williams, 479 So.2d 329 (La.1986); Louisiana State Bar Association v. Daye, 443 So.2d 1107 (La.1983); and Louisiana State Bar Association v. Jacques, 260 La. 803, 257 So.2d 413, cert. denied, 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972).
Considering the seriousness of Thierry’s misconduct, and the aggravating and mitigating factors, the appropriate discipline is disbarment.

Decree

For the reasons assigned, it is ORDERED, ADJUDGED, AND DECREED that the name of Overton C. Thierry be stricken from the roll of attorneys and that his license to practice law in Louisiana be revoked and cancelled at his cost.

.DR 9-102 provided in pertinent part: Preserving Identity of Funds and Property of Client
A. All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank or insured depository institution accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
1. Funds reasonably sufficient to pay bank charges may be deposited therein.
2. Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
B. A lawyer shall:
1. Promptly notify a client of the receipt of his funds, securities or other properties.
2. Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
3. Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
4. Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

. DR 1-102(A) provided in subsections (4), (5) and (6):
Misconduct
(A) A lawyer shall not:
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

. DR 6 — 101(A)(3) provided:
Failing to Act Competently
(A) A lawyer shall not:
(3) Neglect a legal matter entrusted to him.

. DR 1-102(A)(3) provided:
Misconduct
(A) A lawyer shall not:
(3) Engage in illegal conduct involving moral turpitude.

. Rule 3.4(a) and (b) provides:
Fairness to opposing party and counsel A lawyer shall not:
(a)Unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;
(b) Falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law.

.Rule 8.4(a), (c) and (d) provides:
Misconduct
It is professional misconduct for a lawyer to: (a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) Engage in conduct that is prejudicial to the administration of justice.

. Disbursements by Thierry:
Rose Francis I 1,000.00
Rose Francis 135.00
Anesthesia East 550.00
Premium to Reserve Life 272.00
Ford Motor Credit Co. 2,610.00
Rose Francis 1,086.85
Ford Motor Credit Co. 8,171.00
Operative report 25.00
Dr. R.C. Llewellyn 1,000.00
Dept, of Public Safety 5.00
Pendleton Methodist Hospital 1,350.00
Rose Francis settlement 4,253.85
$20,458.70

. Rule 1.15(a), (b) and (c) provides:
Safekeeping property
(a)A lawyer shall hold property of clients or third persons that is in a lawyer’s possession in connection with a representation separate from the lawyer’s own property. Funds shall be kept in a separate account maintained in a bank or similar institution in the state where the lawyer’s office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

. Rule 8.4(g) provides:
Misconduct
It is professional misconduct for a lawyer to:
(g) Except upon the expressed assertion of a constitutional privilege, to fail to cooperate with the Committee on Professional Responsibility in its investigation of alleged misconduct.