*957 ATTORNEY DISCIPLINARY PROCEEDINGS.
| .PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, William Ray Black, Jr., an attorney licensed to practice law in Louisiana.
FORMAL CHARGES
The ODC filed two sets of formal charges against respondent. The first set of formal charges, consisting of one count and bearing the disciplinary board’s docket number 02-DB-069, was filed on July 8, 2002. The second set of formal charges, also consisting of one count, bears the disciplinary board’s docket number 03-DB-016 and was filed on March 27, 2003. The two sets of formal charges were consolidated by order of the hearing committee chair dated July 17, 2003.

02-DB-069

The Mote Matter

In 1999, several years after Henry Mote was permanently disabled in a work-related offshore accident, he retained respondent to handle estate planning and financial management matters for himself and his family. Respondent was authorized to sign checks drawn on Mr. Mote’s bank account to pay medical expenses for Mr. Mote and his family, as well as certain living expenses for Mr. Mote’s daughter and Rmother. Respondent was also authorized to write checks from the account to pay himself for professional services and to pay Mr. Mote’s income taxes.
By April 2001, Mr. Mote had begun to notice a significant increase in the number and dollar amount of checks written by respondent to himself. After consulting with his advisors, Mr. Mote discharged respondent on June 2, 2001 and informed him that he was no longer authorized to write checks on the bank account, which was to be closed. By letter to Mr. Mote and his wife dated June 5, 2001, respondent acknowledged the termination of his representation and advised that “No further checks where [sic] written on [your] account after notice was given that it was being closed.”
After discharging respondent, Mr. Mote retained a CPA, Gus Levy, to handle his financial affairs. To smooth the transition to the CPA firm, Mr. Levy requested that respondent provide copies of Mr. Mote’s accounting records and tax returns, and the invoices supporting the disbursements previously made from Mr. Mote’s account. Respondent failed to provide the requested *958 information and refused to communicate with either Mr. Mote or Mr. Levy.
In November 2001, Mr. Mote filed a complaint against respondent with the ODC. The complaint alleged that respondent wrote checks to himself instead of paying Mr. Mote’s income taxes, and charged Mr. Mote for tax preparation services he never performed. Mr. Mote also alleged that several months after respondent was terminated, he attempted to apply for a credit card in Mr. Mote’s name, but using his own mailing address.
Respondent replied to the complaint in February 2002 and denied any misconduct; however, he refused to comply with the ODC’s numerous requests for supporting documentation. In response, Mr. Mote and Mr. Levy provided the ODC |3with copies of Mr. Mote’s bank statements and canceled checks, as well as the statements respondent submitted to Mr. Mote in 2001. These documents reveal numerous irregularities in respondent’s handling of Mr. Mote’s bank account. Respondent consistently reported incorrect check amounts on the statements he submitted to Mr. Mote, usually with respect to the checks written by respondent to himself.[1] Furthermore, respondent withdrew more than $100,000 from Mr. Mote’s account for attorney’s fees without ever providing an accounting to his client for the work he performed. This included at least $19,285 in attorney’s fees for the month of April 2001 alone,[2] and $42,955 in checks written by respondent in July 2001, after his representation was terminated.[3] Respondent also did not pay Mr. Mote’s estimated federal income taxes for the first quarter of 2001, although he told Mr. Mote he had done so; rather, on April 3, 2001, respondent wrote a check to himself for $3,215 (with a memo indicating “Taxes 1st Qtr 2001”) and deposited the check into his personal account. When Mr. Levy contacted the IRS to ensure the payment was made, he was informed that no payment had been received or applied to Mr. Mote’s account in 2001.
The ODC alleged respondent’s conduct in the Mote matter violated the following provisions of the Rules of Professional Conduct: Rules 1.15 (safekeeping ¿¿property of clients or third persons), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act reflecting adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(g) (failure to cooperate with the ODC in its investigation).

03-DB-016

The Camiouehe Matter

In early 1998, Edna Carmouche, an elderly widow, was introduced to respon *959 dent by her financial advisor, George Thompson, to handle an estate planning matter involving an irrevocable trust. After meeting with respondent, Mrs. Car-mouche retained him to establish the Edna A. Carmouche Irrevocable Trust (the “trust”). Respondent drafted the trust documents in March 1998 and named himself as trustee of the trust without advising Mrs. Carmouche of the potential conflict of interest.
In April 1998, the trust purchased two insurance policies issued by United Investors Life Insurance Company on the life of Mrs. Carmouche. The annual premiums for the two policies together totaled in excess of $50,000. In 1999 and 2000, Mrs. Carmouche made contributions to the trust in full payment of the annual premiums on the policies, and respondent properly remitted the payments to United Investors Life. However, in the spring of 2001, Mrs. Carmouche became concerned that she had not heard from respondent regarding the amount of the premiums that would come due in May 2001. At Mrs. Carmouche’s request, Mr. Thompson attempted to contact respondent. After much effort, Mr. Thompson learned that respondent had closed his Baton Rouge law office in the fall of 2000 and moved to New Mexico without notifying Mrs. Car-mouche.
| fiMrs. Carmouche eventually located respondent and forwarded him a check in the amount of $52,067 dated May 23, 2001 and payable to the trust. Respondent endorsed the check and deposited it into an account in the name of the trust opened with a bank in Texas. On May 28, 2001, respondent paid the annual premium on one of the insurance policies with a check from the account in the amount of $24,867. The premium on the second insurance policy was never paid. Instead, between late May 2001 and late June 2001, respondent wrote seven checks to himself totaling $27,400.[4] Respondent deposited the checks into his personal bank account and converted the entirety of these funds to his own use.[5]
Mr. Thompson and Mrs. Carmouche both tried for several months to get answers from respondent as to why the second premium had not been paid. Respondent later spoke to Mr. Thompson and claimed the premium was not paid because he needed further information concerning the allocation of the funds to particular investments within the policy. Mr. Thompson sent respondent a letter in September 2001 addressing this issue, yet the premium remained unpaid. Finally, on December 12, 2001, respondent spoke directly with Mrs. Carmouche by telephone. On the same day, Mrs. Carmouche sent respondent a letter specifically instructing him to remit the premium payment to the insurance company and also asking him to provide her with all of the trust documents and records so she could appoint a new | rtrustee. Respondent did not comply with *960 Mrs. Carmouche’s requests, though he did resign as the trustee of the trust.
In June 2002, Mr. Thompson filed a complaint against respondent with the ODC. Respondent replied to the complaint in November 2002 and denied any misconduct. Respondent claimed that in 2001, the earnings on one of the life insurance policies was “below acceptable standards,” so he decided that “other investments” should be made with those funds. However, according to respondent, a “downturn in the stock market” subsequently caused the trust to suffer a loss of the investment. Respondent expressed regret for the loss, but suggested that all of his decisions were “based on good sound business fundamentals” and were “made within the authority granted by the trust.” In light of these representations, the ODC asked that respondent provide an accounting of the trust funds and documentation regarding the other “investments.” Respondent failed to provide the requested information.
The ODC alleged respondent’s conduct in the Carmouche matter violated the following provisions of the Rules of Professional Conduct: Rules 1.2 (scope of the representation), 1.4 (failure to communicate with a client), 1.15, 8.1(a) (knowingly making a false statement of material fact in connection with a disciplinary matter), 8.1(c) (failure to cooperate with the ODC in its investigation), 8.4(a), 8.4(c), and 8.4(g).
DISCIPLINARY PROCEEDINGS
Respondent was served with both sets of formal charges by certified mail,[6] but he failed to answer or otherwise reply thereto. Accordingly, the factual allegations contained in the formal charges were deemed admitted and proven by clear and ^convincing evidence pursuant to Supreme Court Rule XIX, § 11(E)(3). No formal hearing was held, but the parties were given an opportunity to file with the hearing committee written arguments and documentary evidence on the issue of sanctions. The ODC submitted its evidence with respect to both sets of formal charges on July 31, 2003. Respondent filed nothing for the hearing committee’s consideration in either matter.

Hearing Committee Recommendation

Based on the facts that were deemed admitted, the hearing committee found respondent violated Rules 1.15(a)(b)(c), 8.4(a), 8.4(b), 8.4(c), and 8.4(g) of the Rules of Professional Conduct.[7]
The committee determined that respondent violated duties owed to his clients, the legal profession, and the disciplinary system. Respondent converted client funds to his own use in both the Mote matter and the Carmouche matter. Respondent also failed to cooperate with the ODC in its investigation of these matters, and in the Carmouche matter, even provided false and misleading information to the ODC. The committee concluded respondent’s misconduct was intentional and caused serious harm to the legal profession by impugning the profession’s ethics, to the disciplinary system by failing to cooperate, and to his clients by converting funds.
As aggravating factors, the committee recognized respondent’s dishonest or selfish motive, a pattern of misconduct, multi- *961 pie offenses, bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules or orders of the disciplinary agency, false statements made during the disciplinary process, re-fusallsto acknowledge the wrongful nature of the conduct, vulnerability of the victims, substantial experience in the practice of law (admitted 1995), and indifference to making restitution. The only mitigating factor found by the committee is the absence of a prior disciplinary record.
Considering the ABA’s Standards for Imposing Lawyer Sanctions and Louisiana State Bar Ass’n v. Hinrichs, 486 So.2d 116 (La.1986), the committee determined the baseline sanction in this matter is disbarment. However, in light of the egregious nature of respondent’s conduct in both sets of formal charges, the committee recommended that respondent be permanently disbarred.
Neither respondent nor the ODC filed an objection to the hearing committee’s recommendation.

Disciplinary Board Recommendation

Noting the factual allegations of the formal charges were deemed admitted and proven by clear and convincing evidence pursuant to Supreme Court Rule. XIX, § 11(E)(3), the disciplinary board agreed that respondent violated the Rules of Professional Conduct as charged in 02-DB-069. In 03-DB-016, the board found that respondent violated Rules 1.3, 1.4, 1.5, 3.2, 8.1(c), and 8.4(g) of the Rules of Professional Conduct.[8]
The board adopted nearly the entirety of the hearing committee’s report, including the committee’s application of the factors considered in imposing sanctions, the committee’s assessment of the aggravating and mitigating circumstances, and the committee’s recommendation that respondent’s misconduct warrants permanent lodisbarment. The board recommended that respondent be ordered to provide ac-countings to his clients and make restitution as appropriate, and that he be assessed with all costs and expenses of these proceedings.
Neither respondent nor the ODC filed an objection to the disciplinary board’s recommendation.
DISCUSSION
The deemed admitted facts in this case overwhelmingly support a finding that respondent violated the Rules of Professional Conduct as charged in both sets of formal charges. Respondent intentionally converted a significant amount of client funds in both the Mote and Carmouche matters, seriously harming both clients. Despite repeated requests, respondent would not provide accountings to his clients, nor has he ever paid any restitution for the funds he converted. Respondent also failed to cooperate with the ODC and made false statements when he said that he had invested Mrs. Carmouche’s money and provided the new trustee with the trust documents. Therefore, the sole issue presented for our consideration is the appropriate sanction for respondent’s misconduct.
In determining an appropriate sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La. *962 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
| ^Respondent's conduct clearly violated duties owed to his clients, the legal system, and the profession. Unquestionably, the baseline sanction for such misconduct is disbarment. While we accept in mitigation that respondent has no record of prior attorney discipline, the aggravating factors present in this case are of such great weight that no lesser sanction can be justified.
Having found disbarment is the appropriate sanction, the sole remaining question is whether respondent’s conduct is so egregious that he should be permanently prohibited from seeking readmission to the practice of law.
In Appendix E to Supreme Court Rule XIX, we set forth guidelines illustrating the types of conduct which might warrant permanent disbarment. While these guidelines are not intended to bind this court in its decision-making process, they present useful information concerning the types of conduct we might consider worthy of permanent disbarment. Guideline 1 applies to “repeated or multiple instances of intentional conversion of client funds with substantial harm.” Respondent’s reprehensible conduct in handling the affairs of Mr. Mote and Mrs. Carmouehe clearly falls within the scope of this guideline.
The nature of the misconduct subject of the instant proceedings, coupled with respondent’s demonstrated indifference to the safekeeping of his client’s property, convincingly establishes that he is not morally fit to practice law and that he poses a threat of danger to the public in the event he is permitted to resume practicing law. Respondent has ignored his obligation to uphold the high standards of honesty and righteousness that he assumed when he took the oath as a member of the bar of this state. Louisiana State Bar Ass’n v. Haylon, 250 La. 651, 198 So.2d 391, 392 (1967). He has used his law license not to foster the high standards of the profession, but to l^exploit his clients for his own benefit. This court cannot and will not tolerate such conduct. Without question, respondent must be permanently disbarred.
Accordingly, we will accept the disciplinary board’s recommendation and impose permanent disbarment.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, it is ordered that the name of William Ray Black, Jr., Louisiana Bar Roll number 23436, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. Respondent is ordered to provide complete accountings and full restitution to his victims. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. For example, respondent reported to Mr. Mote that he had written himself a check of $1,150 for his legal fees in the month of December 2000. However, Mr. Mote's bank statement revealed that the check had actually been written in the amount of $2,650.

. According to Mr. Levy’s calculations, respondent would have had to work between 82 and 164 hours to earn the fees he charged to Mr. Mote in April 2001.

. The sixteen checks respondent deposited into his personal account during July 2001 were dated between March 29, 2001 and July 31, 2001; however, the sequence of check numbers (ranging from number 1201 to number 2729) was haphazard and did not fit into the number range of the other checks written during those months, indicating to Mr. Levy that respondent "used old checks and backdated them in an effort to collect even more money from the Motes.” The notations on the checks indicated that they represented payment for respondent's attorney's fees for the months of March 2001 through July 2001, even though respondent had not reported these fees to Mr. Mote and had been terminated as of June 2, 2001.

. These include a May 26, 2001 check in the amount of $2,500 for legal fees; two checks dated June 4, 2001 and totaling $5,950 for “accounting'' fees; a June 14, 2001 check in the amount of $2,650 for ''advisor” fees; and a June 29, 2001 check in the amount of $7,200 for "investments.” Two checks dated June 19, 2001 ($3,600) and June 21, 2001 ($5,500) contain no notation explaining the purpose of the payment. Mrs. Carmouche did not authorize respondent to write any of these checks, having entrusted the funds to respondent solely for the purpose of paying the annual premiums on the two insurance policies owned by the trust.

. Respondent actually converted more funds than were provided to him by Mrs. Car-mouche, causing the trust’s bank account to be overdrawn by $215.38. To correct the overdraft, respondent re-deposited the sum of $300 to the account on July 23, 2001.

. The certified mail was delivered to respondent in April 2003 at an address in El Paso, Texas. Both return receipt cards were signed by respondent personally.

. The hearing committee did not find a violation of Rules 1.2, 1.4, 8.1(a), or 8.1(c) as alleged by the ODC in 03-DB-016. However, this may have been an oversight as the committee simply adopted "in toto” the rule violations found in 02-DB-069.

. The board’s findings in 03-DB-016 are somewhat puzzling, given that the ODC did not charge respondent with violations of Rules 1.3, 1.5, or 3.2. Moreover, the board failed to find rule violations that were actually charged by the ODC and which are clearly supported by the deemed admitted facts.